**In the Interest of A.J.L. and C.R.L., Children.**

**No. 2–03–040–CV.**

Court of Appeals of Texas, Fort Worth.

April 29, 2004.

Bruce Isaacks, Crim. Dist. Atty., Charles E. Orbison, Bill Kuykendall, Asst. Crim. Dist. Atty's, Denton, Matthew Paul, State Prosecuting Atty., Austin, for State.

PANEL A: TERRIE LIVINGSTON, DAUPHINOT, and MCCOY, JJ.

## OPINION

TERRIE LIVINGSTON, Justice.

Appellant Michelle L. appeals the trial court's order terminating her parental rights to her children, A.J.L. and C.R.L. In two points, she complains that: (1) the trial court erred by allowing the attorneys for respondent, Donald "Bobby" Wall, and intervenors, Jose and Yolinda Trevino, to present closing arguments to the jury; and (2) the trial court abused its discretion by allowing expert opinions when there were no grounds for admissibility under a *Daubert/Robinson* analysis or because the opinions were based upon hearsay. In three supplemental points, appellant argues that: (1) the evidence is legally and factually insufficient to prove appellant knowingly placed or allowed the children to remain in conditions and surroundings that endangered their physical or emotional well being; (2) the evidence is legally and factually insufficient to prove appellant engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well being; and (3) the evidence is factually insufficient to prove that termination of appellant's parental rights was in the best interest of the children. We affirm.

## FACTS

David M. Wacker, Denton, for Appellant.

Appellant grew up in foster care and had a lifetime history of violence and an

inability to control her temper and emotions. Child Protective Services in Kansas (KCPS) and Texas Department of Family and Protective Services (DFPS) had removed appellant's children from her care on multiple occasions because they had bruises, burns, and bites on them. Appellant also had a criminal and drug abuse history and an unstable home life and employment history. After the third removal, DFPS petitioned to terminate appellant's parental rights to her two children.

At trial, the Trevinos, paternal grandparents of A.J.L., intervened asking to be named joint managing conservators of A.J.L. The natural father of C.R.L., Donald "Bobby" Wall, filed an original answer to the termination petition and filed a counter-petition asking to be named the sole managing conservator of C.R.L.

During the trial, the court allowed play therapist Brigitte Iafrate to testify on play therapy she conducted with A.J.L. Using puppets in a play acting scenario, it was her opinion that A.J.L. felt that he needed to protect his baby sister and that he had been traumatized at home. Before allowing Iafrate to testify, the trial court conducted a *Daubert* hearing to determine the admissibility Iafrate's expert testimony as a professional counselor. Appellant objected to portions of Iafrate's testimony, contending it was unreliable and based on hearsay. The trial court overruled her objections.

Prior to closing arguments, appellant objected to the Trevinos and Wall making closing arguments to the jury. The trial court overruled her objection, and both presented closing arguments to the jury. The trial court charged the jury only on termination, not conservatorship. The trial court terminated appellant's parental rights based on the jury's findings of endangerment and conduct as to both children.

## CLOSING ARGUMENTS

In her first point, appellant complains that the trial court erred by allowing the attorneys for Wall and the Trevinos to present closing arguments to the jury. The State filed its first amended petition alleging that Wall was the biological father of C.R.L. and asked the court to find that, if reunification could not be achieved, the court terminate his parental rights. Wall, as a respondent, answered with a general denial and filed a counter-petition affirming that he was the biological father of C.R.L., asking that appellant's parental rights to C.R.L. be terminated, and that the trial court award him custody of C.R.L. As a respondent, Wall is also a party to the suit. The Trevinos intervened and filed a petition in intervention requesting custody of A.J.L. The family code expressly provides grandparents with standing to intervene subject to the trial court's discretion. TEX. FAM.CODE ANN. § 102.004 (Vernon 2002). Unless the trial court does not allow the intervention, the intervenors become parties to the suit for all purposes. *In re D.D.M.*, 116 S.W.3d 224, 232 (Tex. App.-Tyler 2003, no pet.). Because the trial court approved the intervention, the Trevinos are also parties to the suit.

After all the evidence is presented in the case, the parties may argue the case to the jury. TEX.R. CIV. P. 269. Where there are several parties to a case, the trial court may prescribe the order of argument between them. *Id.*

■ Appellant argues that because the jury charge addressed only termination issues, Wall and the Trevinos should not have been allowed to make closing arguments. Because they only sought custody of the children and the jury charge did not address custody, appellant contends they had no issues before the jury and should

not have been allowed to argue. Appellant contends that the holding of *City of Houston v. Sam P. Wallace & Co.,* 585 S.W.2d 669 (Tex.1979) applies to the present case because the supreme court held that parties without issues before the jury should not be allowed to make closing arguments. *Id.* at 673. However, *Wallace* can be distinguished from this case because *Wallace* involved a settlement agreement.

In *Wallace,* both the city and employee had actions against the contractor as their common adversary and were both designated as plaintiffs. *Id.* The supreme court held that because the employee secretly settled with the contractor and agreed not to argue negligence against it, the trial was not a fair adversary proceeding. *Id.* Moreover, the court concluded that because after settling with the contractor, the subcontractor's employee had no further claims against anybody and no other party had any claim against him, his counsel had no purpose in making a jury argument. *Id.* at 672.

The present case does not involve a settlement agreement, nor was there an unfair shift in the adversarial alignment of the parties at closing argument. To the contrary, the alignment of these parties remained consistent throughout the trial. Contrary to appellant's assertions, both Wall and the Trevinos filed pleadings. Additionally, both had an interest regarding termination of appellant's parental rights. Wall specifically requested that appellant's rights to C.R.L. be terminated and the Trevinos asked to be appointed managing conservators of A.J.L. Upon the termination of parental rights, the trial court shall appoint a managing conservator of the child. Tex. Fam.Code Ann. § 161.207 (Vernon 2002). Thus, the termination of appellant's rights was a matter of interest to both Wall and the Trevinos. Thus, we conclude that the holding in *Wallace* is

inapplicable to the present case because the parties still had an interest in the termination of appellant's parental rights. We hold that the trial court did not err by allowing Wall and the Trevinos to make closing arguments to the jury. Appellant's first point is overruled.

## EXPERT WITNESS TESTIMONY

Under her second point, appellant complains that the trial court erred by admitting the expert testimony given by licensed professional counselor Brigitte Iafrate because (1) it was not scientifically reliable under *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and (2) the evidence was based, in part, on hearsay. Iafrate testified about play therapy that she conducted on A.J.L.

Rule of evidence 702 governs the admissibility of expert testimony. Tex.R. Evid. 702; *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 718 (Tex.1998); *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 554 (Tex.1995). Texas Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Tex.R. Evid. 702.

■ Once the opposing party objects to proffered expert testimony, the proponent of the witness's testimony bears the burden of demonstrating its admissibility. *Guadalupe–Blanco River Auth. v. Kraft,* 77 S.W.3d 805, 807 (Tex.2002); *Robinson,* 923 S.W.2d at 557. To be admissible, the proponent must demonstrate: (1) that the expert is qualified; and (2) that the expert's testimony is relevant and reliable.

*See Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 499 (Tex.2001); *Robinson,* 923 S.W.2d at 556; *see also Kraft,* 77 S.W.3d at 807.

At the *Daubert* hearing, Iafrate testified that she had been a licensed professional counselor in Texas since 1993. She received a bachelor's degree in psychology from Texas A & M, a master's degree in counselor education, with an emphasis on play therapy, from the University of North Texas (UNT), and had regularly attended continuing education seminars focusing on play therapy and techniques. She received special training in these methods at UNT and at continuing education conferences. She testified that play therapy was one of her areas of expertise and that she had worked with a minimum of one-hundred preschool children. She evaluated A.J.L. using these methods over the course of fourteen different therapy sessions.

The supreme court has identified a non-exclusive list of factors which can be considered in assessing the reliability of scientific evidence.[1] *See Gammill,* 972 S.W.2d at 720; *see also Daubert,* 509 U.S. at 593–95, 113 S.Ct. at 2796–98. In *Nenno v. State,* the court of criminal appeals divided "scientific" expertise into two subcategories: "hard" sciences and "soft" sciences. 970 S.W.2d 549, 560 (Tex.Crim.App.1998), *overruled on other grounds by, State v. Terrazas,* 4 S.W.3d 720, 727 (Tex.Crim. App.1999).

 The court in *Nenno* provided a framework by which to test the reliability of the fields outside of hard science, such as social sciences or other fields based upon experience and training as opposed to scientific method (soft sciences). *Id.* at 561; *In re J.B.,* 93 S.W.3d 609, 629–31 (Tex.App.-Waco 2002, pet. denied) (explaining why *Nenno* framework should be used to evaluate "soft science" testimony in civil cases pending guidance from the supreme court); *see also In re G.B.,* No. 07–01–0210–CV, 2003 WL 22327191, *2 (Tex.App.-Amarillo Oct.10, 2003, no pet.) (memo op.) (applying *Nenno* to a parental termination case). In assessing the reliability of fields outside of hard science, the trial court looks at whether (1) the field of expertise is a legitimate one, (2) the subject matter of the expert's testimony is within the scope of that field and (3) the expert's testimony properly relies upon or utilizes the principles involved in that field. *Nenno,* 970 S.W.2d at 561.

 We review the court's determination under an abuse-of-discretion standard. *See Kraft,* 77 S.W.3d at 807; *Helena Chem. Co.,* 47 S.W.3d at 499; *Robinson,* 923 S.W.2d at 558. To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable. *See Carpenter v. Cimarron Hydrocarbons Corp.,* 98 S.W.3d 682, 687 (Tex.2002); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court

---

**1.** (1) the extent to which the theory has been or can be tested;
(2) the extent to which the technique relies upon the subjective interpretation of the expert;
(3) whether the theory has been subjected to peer review and/or publication;

(4) the technique's potential rate of error;
(5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and
(6) the non-judicial uses which have been made of the theory or technique.
*Gammill,* 972 S.W.2d at 720

would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Downer,* 701 S.W.2d at 241–42.

▰ An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence. *Davis v. Huey,* 571 S.W.2d 859, 862 (Tex.1978); *see also Goode v. Shoukfeh,* 943 S.W.2d 441, 446 (Tex.1997). Furthermore, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court's decision. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 211 (Tex.2002); *Holley v. Holley,* 864 S.W.2d 703, 706 (Tex.App.-Houston [1st Dist.] 1993, writ denied). An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling. *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex.1998).

▰ First, we focus on whether the trial court abused its discretion in determining that play therapy is a legitimate field of expertise. Iafrate testified that play therapy is highly regarded and is a generally accepted method for counseling children. She reviewed the research in the area of play therapy and testified that the research showed that play therapy is a successful and effective way to work with children. She found no studies that challenged the reliability of play therapy. Moreover, she noted that it has been used for decades and is widely accepted in the counseling community. Additionally, caselaw illustrates that play therapy is often used as a basis for expert testimony.[2] Based upon this evidence, we conclude that the trial court did not err in determining

that play therapy is a legitimate field of expertise.

Play therapy uses toys as "therapeutic metaphors" to help children express themselves and their feelings. Iafrate described the types of play therapy that she used. First, she built a safe environment and rapport with the child using the client-centered method. Eventually she switched to the more directive Alderian method where the therapist is more interactive in helping the child identify important aspects of their environment. She used these techniques in a manner consistent with her training during her fourteen counseling sessions with A.J.L.

With respect to whether Iafrate's testimony was within the scope of her legitimate field of expertise and whether she properly utilized the principles of play therapy, we look to her testimony at trial. She testified that A.J.L. came to therapy with her in order to learn how to cope with the abuse that he had suffered. According to Iafrate, when A.J.L. first started coming to her he behaved unusually for a three-year-old because he lacked spontaneity, was obsessive about cleanliness and order, was always putting things away, and was hyper-aware of how Iafrate was reacting to him before he did anything. Comparatively, normal three-year-olds are very spontaneous, carefree, and are not very concerned with making sure that everything is returned to its proper place.

Iafrate initiated play therapy with A.J.L. using a scenario given to her by A.J.L.'s foster mother. She created a scene with puppets that was similar to what the foster mother had described to her. Iafrate des-

---

2. *See In re A.V.,* 849 S.W.2d 393, 401 (Tex. App.-Fort Worth 1993, no writ); *Puderbaugh v. State,* 31 S.W.3d 683, 685–86 (Tex.App.-Beaumont 2000, pet. ref'd); *In re M.T.,* 21 S.W.3d 925, 929 (Tex.App.-Beaumont 2000, no pet.); *see also Campos v. State,* 977 S.W.2d 458, 463–64 (Tex.App.-Waco 1998, no pet.)(allowing expert testimony based upon play therapy in child sexual assault case).

ignated one larger turtle puppet as the mother, and smaller turtles as the little boy and the baby girl. When A.J.L was unwilling to tell the story himself, Iafrate began the story saying that the boy turtle puppet was busy doing something and the mom turtle puppet wanted him to do something else. The boy turtle puppet wanted to keep doing what he was doing, so the mom turtle puppet began to approach the baby girl turtle puppet and the boy turtle puppet said, "No, no, no. Stop. I'll do it. I'll do it."

After Iafrate told that story, she asked A.J.L. if he would like another puppet to help the little boy. A.J.L. chose a mouse. Iafrate described this as a therapeutic technique where the child chooses a puppet that can be a type of counselor, or someone to help him. Because Iafrate had observed that the boy turtle puppet had acted to stop the mom turtle puppet before she got to the baby girl turtle puppet, she asked A.J.L. to show her what the mom turtle puppet did to the baby girl turtle puppet that he felt he had to stop. In response, A.J.L. made a fist with his left hand, made a grabbing motion on the table top, and then returned his hand to a fist. At the end of the same session, A.J.L. initiated the puppet play and had the mom turtle puppet pounce on the baby girl turtle puppet and then grab the baby girl turtle puppet with its hands.

At another session, when A.J.L. came in he pointed to the turtle puppet family and said that he wanted Iafrate to tell the same story with the puppets as before. So she took the boy turtle puppet and the mouse puppet and told the story again. This time the boy turtle puppet was coloring and the mom turtle puppet wanted him to take out the trash. When the boy turtle puppet said he would do it later, the mom turtle puppet started to approach the baby girl turtle puppet. The boy turtle puppet said, "Okay, mom. I will do it. Don't hurt." When Iafrate asked, "what would the mom do to the boy turtle?", A.J.L. took the mom turtle puppet and used it to pounce on the baby girl turtle puppet.

He then put the baby girl turtle puppet on his right hand, and she had him put the boy turtle puppet on the other. Iafrate used the mouse puppet to ask him questions, but A.J.L. would not say yes or no, so they established that, using the turtle puppets, two taps would be "yes", and one tap would be "no." First she used the mouse puppet and asked the *baby girl* turtle puppet, "Does mom ever hurt you?" He tapped twice with the puppet for yes.[3] Iafrate continued stating that the mouse puppet then asked the *baby girl* turtle puppet, "Do you ever tell her to stop?" and the baby girl turtle puppet tapped once for no. She asked, "Do you ever try to run away?" and he tapped twice for yes.

Next, she had the mouse puppet say to the *boy* turtle puppet, "Well, do you ever try to stop the mom from hurting the baby?" and he tapped twice for yes. With regard to hurting the baby, she asked, "Do you ever tell her to stop?" He tapped twice for yes. She then asked, "Do you ever try to run away?" and he tapped twice for yes.

When they worked with the puppets during the next few visits, A.J.L directed Iafrate to use the mom turtle puppet to pounce and jump on the baby girl turtle puppet. When she would do this, A.J.L. would use the boy turtle puppet to grab the baby girl turtle puppet away before the mom turtle puppet could get her. Iaf-

---

**3.** At this point in the testimony, appellant objected on the basis of hearsay and the trial court overruled her objection.

rate opined that this play indicated that A.J.L. felt like he had to protect his little sister from something going on at home.

When asked to contrast A.J.L.'s behavior when he first came to therapy with Iafrate with his behavior after fourteen sessions of therapy, Iafrate stated that, at the start, A.J.L. was fairly rigid, not spontaneous, and obsessive about things being clean and put away. At the end he was spontaneous, carefree, bouncy, had stopped seeking approval for his actions, and was very much into what he was doing. She noted that his rapid behavioral improvement was likely due to the fact that, in foster care, he was in a home environment where he felt safe and secure.

Based upon Iafrate's education, experience and training, her interaction and observations of children using play therapy, together with a total absence of any evidence to refute the validity of play therapy, we hold that the trial court did not abuse its discretion in qualifying Iafrate as an expert witness and allowing her to testify regarding her therapy sessions with A.J.L. Moreover, we hold that her testimony was sufficiently reliable under *Nenno* and the trial court did not err by allowing it.

■■■■■ Appellant also complains that Iafrate's opinion testimony was based upon hearsay. Specifically, she complains of the testimony regarding the session where A.J.L. tapped on the table in response to yes and no questions. An expert may form opinions or make inferences on facts that are not otherwise admissible into evidence if those facts are of the kind reasonably relied upon by experts in the field. TEX.R. EVID. 703; *Stam v. Mack*, 984 S.W.2d 747, 750 (Tex.App.-Texarkana 1999, no pet.); *Sosa ex rel. Grant v. Koshy*, 961 S.W.2d 420, 427 (Tex.App.-Houston [1st Dist.] 1997, no pet.). An expert may testify regarding the underlying facts and data supporting an expert opinion. *Stam*, 984 S.W.2d at 750; *Sosa*, 961 S.W.2d at 427. We hold that the trial court did not err by admitting this portion of Iafrate's testimony. Accordingly, we overrule appellant's second point.

## FACTUAL SUFFICIENCY

■■■■■ In her supplemental points one, two and three, appellant complains that the evidence is factually insufficient to support the jury's findings under family code sections 161.001(1)(D) (endangerment by conditions or surroundings), (E) (endangerment by conduct) and 161.001(2) (best interest of the child). Tex. Fam.Code Ann. §§ 161.001(1)(D), (2).[4] To preserve a challenge to the factual sufficiency of the evidence for appellate review, the party must file a motion for new trial in the trial court. TEX.R. CIV. P. 324(b)(2), (3); *Cecil v. Smith*, 804 S.W.2d 509, 510 (Tex.1991); *In re J.M.S.*, 43 S.W.3d 60, 62 (Tex.App.-Houston [1st Dist.] 2001, no pet.); *In re C.E.M.*, 64 S.W.3d 425, 428 (Tex.App.-Houston [1st Dist.] 2000, no pet.). Appel-

---

4. In appellant's brief, she cites "Tex. Fam. Code, Sec. 161.003(D)" and "Tex. Fam.Code Sec. 161.003(E)" when discussing legal and factual insufficiency on the grounds for termination. However, she tracks the language used in sections 161.001(1)(D),(E) and 161.001(2). TEX. FAM.CODE ANN. §§ 161.001(1)(D),(E), (2). Section 161.003 of the family code does not have a section (E), and section 161.003(d) states, "An attorney appointed under Subsection (b) shall repre-

sent the parent for the duration of the suit unless the parent, with the permission of the court, retains another attorney." TEX. FAM. CODE ANN. § 161.003(d). Appellant does not complain that there was any error regarding representation by her attorney. Therefore, we presume that appellant intended to refer to family code sections 161.001(1)(D),(E) and 161.001(2) and will conduct our analysis accordingly.

lant did not file a motion for new trial. Therefore, she has waived her right to complain about the factual sufficiency of the evidence to support the jury's findings. *See J.M.S.*, 43 S.W.3d at 62 (holding that sufficiency issues must be properly preserved in termination of parental rights case just as in any other civil case); *C.E.M.*, 64 S.W.3d at 427–28 (same). The portions of supplemental points one and two that complain of factual insufficiency are waived. Supplemental point three only challenges the factual insufficiency of the evidence to support the jury's best interest finding. Because appellant waived all of her factual sufficiency challenges on appeal, we overrule appellant's supplemental point three in its entirety.

## LEGAL INSUFFICIENCY

In appellant's supplemental points one and two, she also complains that the evidence was legally insufficient to prove that she knowingly placed or allowed the children to remain in conditions and surroundings that endangered their physical or emotional well being, and engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well being.

 A parent's rights to "the companionship, care, custody and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex.

2002). In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX. FAM. CODE ANN. § 161.206(b) (Vernon Supp.2004); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re D.T.*, 34 S.W.3d 625, 630 (Tex.App.-Fort Worth 2000, pet. denied) (op. on reh'g).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by "clear and convincing evidence." TEX. FAM. CODE ANN. §§ 161.001, 161.206(a); *In re G.M.*, 596 S.W.2d 846, 847 (Tex.1980). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *G.M.*, 596 S.W.2d at 847; *D.T.*, 34 S.W.3d at 630. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2002).

 The higher burden of proof in termination cases alters the appellate standard of legal sufficiency review. *In re J.F.C.*, 96 S.W.3d 256, 265 (Tex.2002). The traditional no-evidence standard does not adequately protect the parent's constitutional interests. *Id.* In reviewing the evidence for legal sufficiency in parental termination cases, we must determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction" that the grounds for termination were proven. *Id.* at 265–66. We

must review all the evidence in the light most favorable to the finding and judgment. *Id.* at 266. This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must, however, consider undisputed evidence even if it does not support the finding. *Id.*

## ENDANGERMENT BY CONDUCT

First, we will review the evidence of endangerment by conduct under family code section 161.001(1)(E). TEX. FAM.CODE ANN. § 161.001(1)(E). When appellant was approximately seven months to a year old, her mother abandoned her, leaving her with her grandmother. Her grandmother went to George and Betty Tidwell for help in caring for appellant. The Tidwells helped care for appellant part-time until they got full custody of her at age eleven or twelve. Appellant began sneaking out, having behavioral problems, and using drugs. The Tidwells eventually placed her in a long-term residential psychological treatment facility for a year. By age fourteen she was in the custody of DFPS.

Appellant ran away from custody often and got involved with drugs and prostitution by age sixteen. By age twenty-five, appellant had an extensive criminal history. At age nineteen, in 1995, she was convicted of theft and was placed on probation. She was also convicted of theft in 1996 and received probation to be served concurrently with the 1995 offense. However, the probation was revoked and she went to jail for a month in October of 2000. She was again convicted of theft in July 2001, this time a felony offense, and received three years' probation. At the time of the termination trial, appellant had been incarcerated for seventy-six days because

the State had filed a motion to revoke her probation for the felony offense.

▮▮▮▮ Appellant gave birth to her first child, A.J.L., while living in Kansas in September of 1998. Appellant's history with KCPS began in December of 1998 and continued as follows:

(1) A.J.L. was three months old in December 1998 when KCPS first investigated appellant for possible abuse because A.J.L. had a bruise or scratch on his cheek. Appellant claimed that a two-year-old girl was jumping on the bed and hit A.J.L. with her shoe and caused the mark.

(2) During the same investigation, KCPS asked appellant about a bite mark on A.J.L.'s leg and an accident that sent A.J.L. to the emergency room with a bloody nose. Appellant claimed a girl at daycare bit him and that he got the bloody nose when she was carrying him and fell.

(3) A.J.L. was four months old when KCPS investigated appellant again for physical abuse of A.J.L. because he had a bump on his head. Appellant claimed that he had fallen off the couch and hit his head.

(4) KCPS removed A.J.L. from appellant's custody in 1999.

After KCPS removed A.J.L., the Tidwells went to Kansas and convinced the Kansas trial court to release appellant and A.J.L. into their custody. The trial court agreed, and appellant and A.J.L. moved back to Denton, Texas with the Tidwells for six months.

The Texas DFPS began investigating appellant in September 2000 because of an allegation of abuse of A.J.L. Specifically, A.J.L. had a burn on his hand and a bite mark on his chest. Appellant claimed that she had left the iron on the floor, plugged in, but set on "off." She assumed that

while she was taking a nap on the couch, A.J.L. turned the iron on and burned his hand by accident. The burn covered the back of his hand and his first three fingers. Appellant woke up to A.J.L. crying. He pointed to the iron and said, "Hurt."

Appellant claimed that the bite on A.J.L.'s chest occurred when she bit him in her sleep because she was having a nightmare. DFPS removed A.J.L. from appellant's custody and placed him with the Tidwells. However, after appellant completed the required DFPS service plan, DFPS returned A.J.L. to appellant in June 2001.

Meanwhile, appellant gave birth to C.R.L. in March 2001. C.R.L.'s father was Donald Wall.[5] DFPS investigated appellant again in December 2001. At the time, A.J.L. was three years old and C.R.L. was nine months. This time, DFPS investigated appellant for abuse of C.R.L. when daycare workers reported that C.R.L. had a large two-inch bruise on her forehead when she was dropped off at daycare. Appellant claimed that C.R.L. did not have the bruise when she dropped her off that morning. Appellant told the investigators that the injury must have been caused by "bedhead," sleeping pressed against her blankets, or by hitting her head on the playpen.

DFPS called the police in to investigate. During their investigation, the police noted that the playpen did not have any hard parts and the sides were made of mesh. Additionally, the police spoke to many witnesses who had heard A.J.L. say that appellant had caused C.R.L.'s injury. DFPS removed the children from appellant's custody in December 2001. The children were initially placed with the Tidwells, and DFPS brought termination proceedings against appellant. By September 2002,

appellant had been incarcerated because the State initiated proceedings to revoke her probation for her prior felony offense.

At trial, multiple witnesses testified to appellant's violent nature. Both Betty and George Tidwell testified at trial and described appellant as violent. Betty Tidwell stated that when appellant was a baby she bit people all the time. Appellant admitted that at age fourteen, while she was living with the Tidwells, she bit Betty Tidwell during an argument. The bite was severe enough to leave a permanent scar. George Tidwell testified that on one occasion when appellant lived at their house, she cut the neighbor's arm with a pocket knife. Additionally, both of the Tidwells described a fight that appellant had with their daughter after A.J.L. was born during which appellant attempted to blind her by clawing her eyes out.

The Tidwells also described two instances in which appellant had threatened to kill them. After appellant lived in the long-term residential treatment facility, the Tidwells dropped their suit to get custody of her and relinquished her into DFPS custody. Around this time, appellant called Betty Tidwell and told her that she was going to come back to their house on her seventeenth birthday and kill her. Years later, after the birth of her children, appellant called the Tidwells in June of 2002 and told George, "I swear to God, if I lose these kids, I'm going to kill you and your family." In response to this threat, the Tidwells got a protective order against appellant. Both Betty and George Tidwell believe appellant was capable of killing them during one of her fits of rage.

Denton Police officer Tim Scott testified that he investigated appellant for assault in August 2002. The incident occurred at William Fields's house. Apparently, ap-

5. A.J.L.'s father was Randall "Scotty" Trevino.

pellant went to his house, argued with Fields and bit his upper arm during the argument. The officer saw the bite and noted that it was bloody and that the blood ran all the way down Fields's arm to his fingers, the skin was gnarled, and the bite was the type that grabbed hold and ripped the skin loose. He opined that it was a "nasty" bite. Officer Scott noted that appellant seemed high on drugs. The police arrested appellant for assault/family violence.

At another time, appellant got into a fight with a friend named Linda Nabors. While the two were arguing, appellant got into her car and left, and Nabors followed in her own car. Nabors decided to give up the chase and passed appellant as she drove away, when appellant began following Nabors. Eventually, Nabors pulled over onto the side of the road to attempt to talk to appellant. As she stood in front of appellant's car, appellant accelerated and hit Nabors, throwing her up onto the hood of the car and causing serious injuries.

After a review of the evidence, we hold that the physical symptoms of abuse on the children, appellant's admitted drug abuse, her criminal history and incarceration, the expert witness testimony regarding A.J.L., appellant's long history with DFPS and KCPS, and her continuing course of violent conduct are all sufficient to support the jury's finding that appellant engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well being. We overrule the remainder of appellant's supplemental point two.

### ENDANGERMENT BY ENVIRONMENT OR SURROUNDINGS

To support the trial court's order terminating appellant's parental rights, the State only had to present sufficient evidence to support one of the section 161.001(1) factors and show that termination was in the best interest of the child under section 161.001(2). TEX. FAM.CODE ANN. § 161.001; *In re C.A.J.*, 122 S.W.3d 888, 892–93 (Tex.App.-Fort Worth 2003, no pet.); *In re W.J.H.*, 111 S.W.3d 707, 714 (Tex.App.-Fort Worth 2003, pet. denied); *In re W.S.*, 899 S.W.2d 772, 776 (Tex.App.-Fort Worth 1995, no writ). Because we hold that there was sufficient evidence to support the jury's findings under family code section 161.001(1)(E) and because appellant waived her complaint regarding best interest under section 161.001(2), we need not address appellant's supplemental point one complaining of legal insufficiency under section 161.001(1)(D). *See* TEX. FAM. CODE ANN. § 161.001; TEX.R.APP. P. 47.1; *In re S.F.*, 32 S.W.3d 318, 320 (Tex.App.-San Antonio 2000, no pet.). We overrule the remainder of supplemental point one.

### CONCLUSION

Having overruled all of appellant's points, we affirm the trial court's order of termination.