IN RE H.G.

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-129-CV

IN THE INTEREST OF 

H.G., A CHILD 

------------

FROM THE 322ND DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I.  Introduction

Appellant Natasha C., the biological mother of four-year-old H.G., filed a notice of appeal contesting the trial court’s order terminating her parental rights.  In five issues, appellant contends (1) that the evidence was factually insufficient to support the jury’s best interest finding, (2) that the evidence was factually insufficient to support the jury’s section 161.001(1)(D)  endangerment finding, (3) that the evidence was factually insufficient to support the jury’s section 161.001(1)(E) endangerment finding, (4) that the evidence was factually insufficient to show that appellant constructively abandoned H.G., and (5) that section 263.405(i) is not a bar to appellant’s sufficiency complaints.  
Tex. Fam. Code Ann.
 § 161.001(1)(D), (E) (Vernon Supp. 2006).  Because we hold that the evidence was factually sufficient to support the jury’s best interest and section 161.001(1)(E) endangerment findings, we affirm.

II.  Factual Background

Child Protective Services (“CPS”) investigator Lisa Lambert arrived at appellant’s apartment on September 18, 2004, and Brandon C., H.G.’s stepfather, answered the door.  Brandon had a black eye, dark bruises, a bloody ear, facial cuts, and a neck wound allegedly caused by appellant’s use of brass knuckles.  When Lambert asked H.G. what happened, she said that “Mommy did it.”  Additionally, appellant admitted that she hit Brandon because she was upset that he had not cleaned up the apartment or put the children to bed when she came home.  Because of this investigation, CPS removed H.G. and C.G., H.G.’s ten-month-old brother, from appellant’s home.  

Dr. Rhonda Polakoff, a psychologist, evaluated H.G. immediately and determined that H.G. had symptoms consistent with a child who has difficulty coping.  Dr. Polakoff diagnosed H.G. with a depressive disorder, an adjustment disorder, and with a post-traumatic stress disorder.  Sheila Nash, H.G.’s foster parent, caught four-year-old H.G. masturbating on several occasions.  
When Nash asked H.G. why she did it, H.G. said that “Daddy” Brandon showed her how to make her “cookies” feel better.

In addition to engaging in domestic violence, appellant had mental disorders and a history of drug dealing and usage.  Also, prior to the termination trial, appellant missed twenty-four out of forty-four visits with H.G. and failed to complete the drug testing portion of her CPS service plan. 

III.
  
Statement of Points

Because appellant’s fifth issue is potentially dispositive, we address it first.  Appellant asserts that section 263.405(i) of the Texas Family Code is not a bar to her other four complaints because (1) she complied with it, (2) to the extent she did not comply with it, the court should excuse compliance under rule 2 of the Texas Rules of Appellate Procedure, and (3) section 263.405(i) constitutes a violation of the separations of powers provision of the Texas Constitution.  

Section 263.405(i) of the Texas Family Code provides,

The appellate court may not consider any issue that was not specifically presented to the trial court in a timely filed statement of the points on which the party intends to appeal or in a statement combined with a motion for new trial.  For purposes of this subsection, a claim that a judicial decision is contrary to the evidence or that the evidence is factually or legally insufficient is not sufficiently specific to preserve an issue for appeal.
(footnote: 2)

The State does not contend that appellant failed to preserve her complaints.   We agree with both parties that appellant sufficiently pled and timely filed the statements of points for new trial.
  See 
Tex. Fam. Code Ann.
 § 263.405(i).
  Accordingly, we sustain appellant’s fifth issue.  We do not address the other two subissues because appellant complied with section 263.405(i). 

IV. Endangerment, Abandonment, and Best Interest of the Children

A.  Endangerment and Abandonment Findings

In her second and third issues, appellant argues that the evidence is factually insufficient to support the jury’s findings that she (1) engaged in conduct that endangered H.G.’s physical or emotional well-being and (2) knowingly placed or knowingly allowed H.G. to remain in conditions which endangered her physical or emotional well-being.  In her fourth issue, appellant claims that the evidence is factually insufficient to support the jury’s finding that she constructively abandoned H.G.

A parent’s rights to “the companionship, care, custody, and management” of his or her children are constitutional interests “far more precious than any property right.”  
Santosky v. Kramer
, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982).  “While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.”  
In re C.H.
, 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child’s right to inherit.  
Tex. Fam. Code Ann. 
§ 161.206(b); 
Holick v. Smith,
 685 S.W.2d 18, 20 (Tex. 1985)
. 
 We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  
Holick
, 685 S.W.2d at 20-21;
 In re D.T.
, 34 S.W.3d 625, 630 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh’g).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child under subdivision (2).  
Tex. Fam. Code Ann. 
§ 161.001(1), (2); 
Richardson v. Green
, 677 S.W.2d 497, 499 (Tex. 1984); 
Swate v. Swate
, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  
Tex. Dep’t of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process also requires the petitioner to justify termination by clear and convincing evidence.  
Tex. Fam. Code Ann. 
§§ 161.001, 161.206(a); 
In re G.M.
, 596 S.W.2d 846, 847 (Tex. 1980).  This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings.  
G.M.
, 596 S.W.2d at 847; 
D.T.
, 34 S.W.3d at 630.  It is defined as the “measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.”  
Tex. Fam. Code Ann.
 § 101.007 (Vernon 2002).  

1
.  Factual Sufficiency Standard of Review
 

The higher burden of proof in termination cases alters the appellate standard of factual sufficiency review.  
C.H.
, 89 S.W.3d at 25.  “[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance.”  
Id
.  In considering whether the evidence of termination rises to the level of being clear and convincing, we must determine “whether the evidence is such that a factfinder could reasonably form a firm belief or conviction” that the grounds for termination were proven.  
Id
.  Our inquiry here is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated one of the conduct provisions of section 161.001(1) and that the termination of the parent’s parental rights would be in the best interest of the child.  
Id
. at 28. 

2.  Analysis

At trial, Lambert, the CPS investigator, testified that she received a call about H.G. on September 18, 2004.  The caller alleged that appellant and Brandon engaged in violent physical altercations in front of the child.  When Lambert arrived at Brandon and appellant’s apartment, Brandon answered the door.  Initially, Brandon denied his identity, but when Lambert confronted him about the work apron he was wearing that still had his nametag attached, Brandon admitted to his identity.  Lambert testified that Brandon had a “beat up” face, a black eye, dark bruises, a bloody ear, and lots of cuts.  Lambert also testified that she had received a report that appellant hit Brandon with brass knuckles.  In addition to Brandon’s facial injuries, there was a bruise on his neck consistent with an injury caused by such a weapon.  In Lambert’s opinion, the injuries had all just recently been inflicted.

After speaking with Brandon, Lambert entered the home and spoke with H.G.  H.G. told her that “Mommy did it, and Mommy hurt Daddy Brandon, and Mommy was mad.”  When Lambert spoke with appellant, appellant admitted that she hit Brandon because she was upset that he had not cleaned up the apartment or put the children to bed.  Because of this investigation, CPS ultimately removed H.G. and C.G. for domestic violence concerns.  While in Lambert’s custody, H.G. threw a “temper tantrum times ten,” and acted abusive towards C.G.

Appellant’s mother, Vivian Mayo-Martin, opined that H.G. often witnessed violent physical altercations between appellant and Brandon.  Vivian testified that during these altercations, Brandon used ten-month-old C.G. as a shield from appellant’s blows.  Whenever appellant called, Vivian would immediately pick up H.G. and C.G. because she did not want them to observe appellant’s violence.

Vicki Olstien, Brandon’s aunt, also testified about appellant’s violent tendencies.  Olstien testified that appellant and Brandon lived with her for around two months after Brandon had been shot in October of 2005.  Olstien stated that on one occasion, she heard Brandon yelling for help in his bedroom.  When Olstien’s son broke down the door, Olstien saw appellant biting Brandon’s finger and kicking him repeatedly.  After Olstien broke up the fight, appellant and Brandon said that “they were on a three-day down cycle from doing some speed.”  Then later, when Olstien tried to break up another fight between appellant and Brandon, appellant bit Olstien’s finger and wrestled with her on the floor.  Appellant also used a piece of wood from the bed to hit Olstien’s husband in the shoulder.  Ultimately, Olstien called the police because appellant and Brandon refused to leave; the police arrived shortly thereafter and arrested appellant.

At the trial termination, appellant maintained that neither H.G. nor C.G. had seen her hit Brandon.  However, she believed that slapping men was “not a big deal” and admitted that H.G. had seen her slap Brandon two or three times.  Appellant testified that whenever H.G. saw her slap Brandon, H.G. asked her to stop hitting and hurting her daddy.

Dr. Polakoff evaluated H.G. in October 2004, and determined that H.G. had extreme tantrums, was aggressive, and would self-mutilate, all symptoms consistent with a child who has difficulty coping.  Dr. Polakoff diagnosed H.G. with an adjustment disorder, a depressive disorder, and with a post-traumatic stress disorder.  Nash, H.G.’s foster parent, agreed with Dr. Polakoff’s assessment and testified that H.G. would often bang her head against the wall, slap herself in the face, pull out her hair, and bite herself.  Nash noted that the slightest thing could send H.G. into a rage, including someone placing a napkin on her the wrong way.  

Nash also testified that H.G. would act out sexually.  Specifically, on the first day that Nash brought H.G. home, H.G. masturbated to orgasm while sitting in the car seat.  On another occasion, according to Nash, H.G. said that Brandon showed her how to make her “cookies” feel better.  On a third occasion, H.G. told Nash that Brandon would stick an object in her “cookies” and make it feel better, and she wished that Nash would do so. 

In addition to allowing H.G. to experience both domestic and sexual abuse, appellant also has a history of drug dealing and drug use.  First, appellant admitted that she sold methamphetamine to support herself and her children.  Appellant also testified that she used marijuana periodically starting at age fourteen and would often smoke on the back porch while the children were in bed.  In September 2004, the same month that CPS removed her children, appellant tested positive for marijuana.  

Based on our review of the entire record, we conclude that a factfinder could reasonably form a firm belief or conviction that appellant engaged in conduct that endangered the physical or emotional well-being of H.G., and therefore, we hold that the evidence is factually sufficient to support the jury’s finding.  
See 
Tex. Fam. Code Ann.
 § 161.001(1)(E); 
In re J.F.C.
, 96 S.W.3d 256, 266 (Tex. 2002); 
C.H.
, 89 S.W.3d at 28.  Accordingly, we overrule appellant’s third issue.

Because a petitioner need establish only one of the acts or omissions enumerated under subdivision (1) of section 161.001, we need not address appellant’s second issue—whether the evidence is factually sufficient to support the jury’s 161.001(1)(D) finding—or appellant’s fourth issue—whether the evidence was factually sufficient to support the jury’s finding that appellant constructively abandoned H.G.  
See 
Tex. Fam. Code Ann.
 ྷ 161.001(1)(D), (N); 
In re A.J.L.
, 136 S.W.3d 293, 305 (Tex. App.—Fort Worth 2004, no pet.); 
In re S.F.
, 32 S.W.3d 318, 320 (Tex. App.—San Antonio 2000, no pet.).  Accordingly, we overrule appellant’s second and fourth issues.

We will next consider whether the jury’s finding that termination of appellant’s parental rights was in H.G.’s best interest was factually insufficient as appellant claims in her first issue.  
See 
Tex. Fam. Code Ann.
 § 161.001(2).

B.  Appellant’s Best-Interest Claim

Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include 

(1) the desires of the child,

(2) the emotional and physical needs of the child now and in the future, 

(3) the emotional and physical danger to the child now and in the future, 

(4) the parental abilities of the individuals seeking custody, 

(5) the programs available to assist these individuals to promote the best interest of the child,

(6) the plans for the child by these individuals or by the agency seeking custody, 

(7) the stability of the home or proposed placement, 

(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and 

(9) any excuse for the acts or omissions of the parent. 

Holley v. Adams
, 544 S.W.2d 367, 371-72 (Tex. 1976); 
In re M.N.G., 
147 S.W.3d 521, 539 (Tex. App.སྭFort Worth 2004, pet. denied).  These factors are not exhaustive.  Some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  
C.H
., 89 S.W.3d at 27; 
M.N.G.
, 147 S.W.3d at 539.  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  
C.H
., 89 S.W.3d at 27; 
M.N.G.
, 147 S.W.3d at 539.  On the other hand, the presence of scant evidence relevant to each 
Holley
 factor will not support such a finding.  
C.H
., 89 S.W.3d at 27; 
M.N.G.
, 147 S.W.3d at 539.

In addition to the above, a parent’s inability to provide adequate care for the child, lack of parenting skills, poor judgment, and repeated instances of immoral conduct may also be considered when looking at the child’s best interest.  
In re C.A.J.
, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.).  We now address those factors for which relevant evidence was admitted.  

1.  The Emotional and Physical Danger to H.G. Now and in the Future

Appellant, H.G., and Vivian all testified that H.G. was present when appellant attacked Brandon.  Further, although H.G. was not present during all of the altercations between Brandon and appellant, there is evidence that H.G.’s self-mutilation and tantrums resulted from living with appellant.  Appellant admitted to not getting along with people, she bit and wrestled with Olstien, and she hit Olstien’s husband in the shoulder with a piece of wood.  Appellant’s violent tendencies clearly pose a physical danger to H.G. now and in the future.  
See Holley
, 544 S.W.2d at 371-72
.  
Additionally, by slapping Brandon at least two times in front of H.G. and by inflicting cuts, bruises, a black eye, a bloody ear, and a possible brass knuckle bruise on Brandon while H.G. was home, appellant placed H.G. in emotional danger.  
See id.

The evidence at trial also showed that appellant had sold methamphetamine, had cared for the children while using marijuana, and failed to maintain steady employment or housing.  Further, Vivian testified that Brandon would use H.G.’s ten-month-old brother as a shield when appellant attacked him.  Brandon also allegedly sexually abused H.G. by teaching her how to make her “cookies” feel better.

Additionally, appellant testified that she had multiple personalities—a good one named Tasha and a bad one named Natasha—and often saw the shadow of her deceased son run around and dance.

Even without considering appellant’s attack on Brandon and its impact on H.G., the evidence supports a finding that appellant was both unstable and indifferent to H.G.’s physical and emotional safety during much of H.G.’s young life.  These instances support the jury’s finding that termination is in H.G.’s best interest.  
See C.H
., 89 S.W.3d at 27; 
M.N.G.
, 147 S.W.3d at 539.

2.  The Plans for the Children by the Agency Seeking CustodyསྭThe Stability of the Home or Proposed Placement

Nash became H.G.’s foster parent on June 8, 2005, and has expressed an interest in adopting her.  Nash makes her living providing foster care, makes approximately $50,000 a year, and is not married.  Nash stated that it is important for children to have a male role model, and that she has three brothers, a son, and a nephew.  Vivian testified at trial that Nash is unfit to adopt H.G. because Nash keeps foster children who come in and out of her home and therefore cannot provide a stable environment for children.

However, during the time that H.G. has been living with Nash, H.G. has experienced less temper tantrums and self-mutilating behavior and does not act out sexually as often.  Beverly Shockey, H.G.’s CPS caseworker, testified that Nash should be allowed to adopt H.G. because appellant was unstable and could not provide the long-term therapy that H.G. needs.  Dr. Polakoff confirmed Shockey’s recommendation that H.G. needs structure and stability to cope with her adjustment, depressive and post-traumatic stress disorders. 

The evidence here shows that H.G.’s lifestyle improved significantly after CPS placed her with Nash, supporting the jury’s finding that termination was in H.G.’s best interest. 
 See C.H
., 89 S.W.3d at 27; 
M.N.G.
, 147 S.W.3d at 539.   

3.  The Acts or Omissions of the Parent Which May Indicate that the Existing Parent-Children Relationship is Not a Proper One

Evidence of a parent’s unstable lifestyle can support a factfinder’s conclusion that termination is in the child’s best interest.  
In re D.S.
, 176 S.W.3d 873, 879 (Tex. App.—Fort Worth 2005, no pet.).  A parent’s drug use, inability to provide a stable home, and failure to comply with her family service plan support a finding that termination is in the best interest of the child.  
Id. 
 Numerous witnesses testified that appellant is emotionally unstable, has anger management issues, and engages in domestic violence.  In addition to these behaviors, appellant has a history of drug distribution and use.  The same month that CPS removed H.G. from appellant’s home, appellant tested positive for marijuana.  The evidence at trial also showed that appellant sold methamphetamine and had cared for H.G. while using marijuana.
  The evidence also showed that prior to the termination trial, appellant completed her CPS-recommended psychological testing and attended two counseling appointments. However, appellant did not follow through with her drug treatment and only came to twenty-four out of forty-four possible visits with H.G.  The last time appellant visited H.G. prior to the March 22, 2006 termination trial was on October 27, 2005.  Additionally, appellant was consistently late to the two-hour visitations. 

Based upon our review of the entire record, we conclude that the jury could have reasonably formed a firm conviction or belief that termination of appellant’s rights was in H.G.’s best interest.  Accordingly, we hold that the evidence is factually sufficient to support the jury’s best interest findings, and we overrule appellant’s first issue.

V.  Conclusion

Having sustained appellant’s fifth issue, we affirm the trial court’s order terminating appellant’s parental rights to H.G.

PER CURIAM

PANEL F: LIVINGSTON, HOLMAN, and GARDNER, JJ.

DELIVERED: January 11, 2007

FOOTNOTES
1:
See
 
Tex. R. App. P
. 47.4.

2:
Tex. Fam. Code Ann.
 § 263.405(i) (Vernon Supp. 2006); 
In re C.R., 
No. 02-06-00099-CV, 2006 WL 3114468, at *1 (Tex. App.—Fort Worth Nov. 2, 2006, no pet. h.) (mem. op.) (Livingston, J., concurring) (analyzing this statute); 
In re D.A.R.
, 201 S.W.3d 229, 230 (Tex. App.—Fort Worth 2006, no pet.) (same).