147 S.W.3d 521 (2004)
In the Interest of M.N.G.
No. 2-03-104-CV.
Court of Appeals of Texas, Fort Worth.
August 19, 2004.
Rehearing Overruled September 16, 2004.
*526 Dean M. Swanda, Arlington, for Appellant.
Tim Curry, Criminal District Atty., Charles M. Mallin, Danielle LeGault, Clifford Bronson, James Teel, Asst. Criminal District Attys., Fort Worth, for Appellee.
Panel B: LIVINGSTON, DAUPHINOT, and WALKER, JJ.

OPINION ON REHEARING
TERRIE LIVINGSTON, Justice.
We deny appellant's motion for rehearing. We withdraw our opinion and judgment of July 1, 2004 and substitute the following to clarify some factual issues raised by appellant's motion for rehearing. The result has not been modified.

INTRODUCTION
Janice H. appeals the trial court's order terminating her parental rights regarding her child M.N.G. In eight points, appellant complains that: (1) the trial court erred by denying her motion to dismiss; (2) the trial court erred by not equalizing peremptory challenges between appellant on one side, and the Texas Department of Family and Protective Services (DFPS) and the attorney ad litem on the other; (3) the trial court erred by denying appellant's motion for mistrial after appellant showed that the other parties were aligned and had coordinated their strikes; (4) she received ineffective assistance of counsel at trial because trial counsel did not preserve error on appellant's second and third issues; (5) the evidence is factually insufficient to support the trial court's finding that termination of the parent-child relationship was in the child's best interest; (6) the evidence is legally insufficient to support termination under section 161.001(1)(D) of the family code; (7) the evidence is legally insufficient to support termination under section 161.001(1)(E) of the family code; and (8) as applied to appellant, section 161.001(1)(M) of the family code is an ex post facto and retroactive law that violates the Texas Constitution. Tex. Fam.Code. Ann. § 161.001(1)(D), (E), (M) (Vernon 2002). We affirm.

FACTS
Appellant had four children prior to giving birth to M.N.G. in 2001. Appellant's rights to her oldest child, H.W., were terminated in April 1990. Years later, DFPS filed an original petition to terminate appellant's parental rights to her three remaining children, D.H., M.H., and L.H. (cause number XXX-XXXXXJ-00). On May 24, 2001, while the termination proceeding was pending, appellant gave birth to M.N.G. DFPS immediately received a referral regarding M.N.G., alleging that appellant had tested positive for barbiturates. DFPS later determined that the allegation was false.
Regardless, on May 31, 2001, DFPS amended its original petition in the pending case (cause number XXX-XXXXXJ-00) to include M.N.G. because it was concerned about appellant's ability to maintain stable housing and employment. The court signed an order appointing DFPS temporary managing conservator of M.N.G. that same day. In June of 2001, M.N.G. left the hospital and went directly into foster care. On July 9, 2001, appellant's rights to D.H., M.H., and L.H., but not M.N.G., were terminated. On appellant's motion, the trial court severed the cause involving M.N.G. on July 11, 2001 and assigned it a separate case number (cause number XXX-XXXXXJ-01).
DFPS acted as M.N.G.'s temporary managing conservator while M.N.G remained in foster care. Nothing else happened in the severed suit regarding *527 M.N.G. until March 21, 2002 when DFPS filed a third amended petition. The third amended petition alleged new facts and requested that appellant's parental rights to M.N.G. be terminated because the rights to her other children had recently been terminated. On April 2, 2002, appellant filed a petition for writ of habeas corpus in the trial court seeking to regain M.N.G. on the grounds that the previous lawsuit (cause number XXX-XXXXXJ-00) had been dismissed and no subsequent action had been filed. Basically, appellant had claimed that the trial court lost jurisdiction because no final order had been entered since the child's removal approximately eleven months prior. Appellant claimed that the trial court lost jurisdiction on July 10, 2002. The trial court denied her habeas relief contra Texas Family Code section 263.401 that generally requires a trial court to dismiss a suit affecting the parent-child relationship if it has not been finalized within one year. Tex. Fam.Code Ann. § 263.401 (Vernon 2002).
On April 5, 2002, DFPS filed yet another new petition with a new cause number (cause number XXX-XXXXXJ-02) and the trial court again appointed DFPS temporary managing conservator of M.N.G. Appellant moved to dismiss cause number XXX-XXXXXJ-02 on January 27, 2003 alleging that it had been more than a year since DFPS was named managing conservator of M.N.G. See Tex. Fam.Code Ann. § 263.401(a). The trial court conducted a hearing and denied appellant's motion.
The case in cause number XXX-XXXXXJ-02 went to trial on March 17, 2003 (within the statutory one-year limit in the new cause number XXX-XXXXXJ-02). The trial court terminated appellant's rights to M.N.G. on April 4, 2003 under Texas Family Code sections 161.001(1)(D), (E), and (M), despite the fact that M.N.G. had never been in appellant's care. Tex. Fam.Code Ann. § 161.001(1)(D), (E), (M). This appeal involves only cause number XXX-XXXXXJ-02. Neither of the prior two cases, cause number XXX-XXXXXJ-00 or cause number XXX-XXXXXJ-01, have been appealed by appellant.[1]

MOTION TO DISMISS
In her first point, appellant complains that the trial court erred by denying her motion to dismiss. The motion alleges as grounds for dismissal the failure of DFPS to comply with the procedural requirements of Texas Family Code section 263.401. Tex. Fam.Code Ann. § 263.401(a). This section requires a trial court to dismiss a suit affecting the parent-child relationship if it fails to render a final order or grant an extension on the first Monday following the anniversary date that the *528 court appointed DFPS as temporary managing conservator.[2]Id.
DFPS was appointed the temporary managing conservator of M.N.G. under the case appealed, cause number XXX-XXXXXJ-02, on April 5, 2002. Appellant contends that we should calculate the dismissal date under section 263.401 from the date DFPS was first appointed temporary managing conservator of M.N.G. on May 31, 2001 in cause number XXX-XXXXXJ-00. If we use this date, the first dismissal date relating to cause number XXX-XXXXXJ-00 is June 3, 2002. See In re Bishop, 8 S.W.3d 412, 420-21 (Tex.App.-Waco 1999, no pet.). Appellant argues that the statutory timetable under section 263.401 expired then. However, before the June 3, 2002 deadline DFPS had abandoned its initial suit involving M.N.G.[3] On April 5, 2002, DFPS had filed a new lawsuit (in cause number XXX-XXXXXJ-02) in which it again sought to terminate appellant's parental rights to M.N.G.
A dismissal under section 263.401(a) is without prejudice so that DFPS may refile the case asserting the same grounds for termination as originally alleged. In re Ruiz, 16 S.W.3d 921, 927 (Tex.App.-Waco 2000, no pet.). However, DFPS cannot keep a child in foster care absent new facts supporting removal from the home. Id. As we noted, DFPS may reinitiate proceedings for termination of parental rights following a dismissal, despite the statutory time limitation, if new facts are alleged justifying relief on the same grounds averred in the first action. In re L.J.S., 96 S.W.3d 692, 694 (Tex.App.-Amarillo 2003, pet. denied); Ruiz, 16 S.W.3d at 927-28. Here, DFPS did just that. We believe these same principles apply when DFPS abandons, rather than dismisses, the initial case.
The petition in cause number XXX-XXXXXJ-02 that DFPS filed on April 5, 2002, alleged some new facts and grounds for termination and was supported by a new affidavit. Under the heading "Required Information" DFPS included two new paragraphs. The first requested that the court waive the requirements of a service plan and reasonable efforts to return M.N.G. to appellant and instead accelerate the trial. The second paragraph requested that the court find that M.N.G. had been subjected to aggravated circumstances because appellant's parental rights had been involuntarily terminated with regard to another child due to appellant's violation of family code section 161.001(1)(D) (conditions which endanger the child), (E) (endangering course of conduct) or a substantially equivalent provision of another state's law. See Tex. Fam.Code Ann. § 161.001(1)(M) (allowing termination of the parent-child relationship based on a finding that the parent's conduct was in violation of section 161.001(1)(D) or (E) or substantially equivalent provisions of the law of another state).
*529 In the new affidavit, DFPS caseworker Stephanie Duren states that M.N.G. is now in foster care instead of the hospital and that DFPS has participated in other litigation concerning M.N.G.'s custody. Duren's new affidavit reflects additional details regarding prior investigations of appellant for abuse of other children. For example, Duren notes that appellant's rights to all four of her other children have been terminated. The rights to appellant's first child, H.W., were terminated in 1990 under the statutory precursor to sections 161.011(1)(D) and (E) of the family code.[4] Later, DFPS filed a petition to terminate appellant's rights to D.H., M.H., and L.H. under section 161.001(1)(D) and (E) of the family code. After appellant executed an affidavit of relinquishment as to these three children, the trial court terminated appellant's parental rights and found that termination was in the best interest of the children.
Further, Duren states that appellant is employed, but does not work much and only receives a small check. Duren pointed out that appellant's living situation was not stable. At the time Duren made the affidavit, appellant was living with a woman who wanted her to move out and told Duren that appellant and M.N.G. would not be welcome there if appellant gets custody of M.N.G. Finally, Duren describes the procedural history of the case, possible placement options, M.N.G.'s custodial situation, medical and developmental treatment, visitation, and counseling. Very little of this information was included in Duren's affidavits supporting the termination petitions in the prior cause numbers.
In light of the above information, we conclude that DFPS pled additional facts sufficient to support refiling the termination proceeding against appellant. See L.J.S., 96 S.W.3d at 694; Ruiz, 16 S.W.3d at 927-28. Because DFPS filed a new cause, alleging new facts, before the statutory period relating to the May 31, 2001 order expired, the trial court did not err by entering new orders appointing DFPS temporary managing conservator of M.N.G. Consequently, DFPS was not required to return M.N.G. to appellant because, for the purposes of appeal in cause number XXX-XXXXXJ-02, the final order in this cause was entered by the Monday following the one-year deadline. See Tex. Fam.Code Ann. § 263.401(d)(1) (requiring the return of the child if more than a year has passed since the trial court ordered the department (DFPS) to serve as temporary managing conservator of the child). For the purposes of cause number XXX-XXXXXJ-02, *530 we conclude that the statutory one year limitation of section 263.401 began to run on April 5, 2002, the date that the trial court entered the order appointing DFPS temporary managing conservator of M.N.G. in that cause. See Tex. Fam.Code Ann. § 263.401(a); In re L.J.S., 96 S.W.3d at 694. Therefore, we hold that the trial court did not err by denying appellant's motion to dismiss in cause number XXX-XXXXXJ-02. Appellant's first point is overruled.

EQUALIZATION OF PEREMPTORY STRIKES AND MOTION FOR MISTRIAL
In her second and third points, appellant complains that the trial court erred by not equalizing the peremptory strikes between appellant on one side, and DFPS and the attorney ad litem for M.N.G. on the other, and by denying her motion for mistrial after she showed that the other parties were aligned and had coordinated their strikes. The State contends that appellant did not make a timely objection to the use of the strikes and thus waived any error relating to these points.
We review the trial court's denial of appellant's motion for mistrial under an abuse of discretion standard. In re J.A., 109 S.W.3d 869, 874 (Tex.App.-Dallas 2003, pet. denied); City of Jersey Village v. Campbell, 920 S.W.2d 694, 698 (Tex.App.Houston [1st Dist.] 1996, writ denied). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles, in other words, whether the act was arbitrary or unreasonable. See Carpenter v. Cimarron Hydrocarbons Corp., 98 S.W.3d 682, 687 (Tex.2002); Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex.1985), cert. denied, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. Downer, 701 S.W.2d at 241-42.
An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence. Davis v. Huey, 571 S.W.2d 859, 862 (Tex.1978); see also Goode v. Shoukfeh, 943 S.W.2d 441, 446 (Tex.1997). Furthermore, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court's decision. Butnaru v. Ford Motor Co., 84 S.W.3d 198, 211 (Tex.2002); Holley v. Holley, 864 S.W.2d 703, 706 (Tex.App.-Houston [1st Dist.] 1993, writ denied). However, a misinterpretation or misapplication of the law also is an abuse of discretion. See Walker v. Packer, 827 S.W.2d 833, 840 (Tex.1992). We must, therefore, determine whether the trial court abused its discretion by allowing DFPS and the ad litem to coordinate their peremptory challenges in a manner inconsistent with rule 233 of the Texas Rules of Civil Procedure. Tex.R. Civ. P. 233.
At voir dire, DFPS used all of its peremptory strikes to strike venire members two, eleven, seventeen, eighteen, nineteen, and twenty. After DFPS had exercised all its strikes, the attorney ad litem began to use his strikes to strike venire member twenty-one. In response, appellant's counsel said, "Wait a minute. Wait a minute. You don't get another six." DFPS responded that the ad litem should be allowed his six strikes because he represented a party and no one had moved to align the strikes. Appellant responded, saying that "Nobody made a motion to expand the number of strikes." The court stated that its position was that the ad litem had an interest that he represented. Appellant *531 said "Okay," and the ad litem went on to exercise his six strikes to remove venire members numbered twenty-one, twenty-two, twenty-five, twenty-six, and twenty-nine. After the ad litem exercised his strikes, the jury was empaneled and sworn, and the court recessed for the day.
The next day, appellant requested an evidentiary hearing on the peremptory strikes that DFPS and the ad litem had exercised the day before. At the hearing, the ad litem admitted that his position was that M.N.G. should stay in DFPS's care and that he had been aligned with the State's position for the last two years. He further admitted telling appellant's counsel the day before that he would leave the selection of the jury up to DFPS and appellant. Despite this representation, the ad litem admitted that he had coordinated the use of his strikes with DFPS in order to avoid duplicating their strikes. He conceded that appellant may have been slightly prejudiced by the fact that he and the DFPS together had twelve peremptory strikes compared to appellant's six. However, he also opined that the jury that had been empaneled was a fair and open-minded one.
Appellant's trial counsel also testified at the hearing. He stated that had it not been for the ad litem's promise that he was not going to use his strikes, appellant would have exercised her strikes more broadly. Appellant's counsel reminded the court that he had objected as soon as it became clear that the ad litem intended to use his strikes. However, the court pointed out that prior to that moment, appellant had made no objections to the alignment of the parties, and appellant agreed. Appellant moved for a mistrial on the basis that the parties were aligned and the peremptory strikes were not equalized between them. The court denied appellant's motion. Additionally, the trial court denied appellant's motion for a stay to file a writ of mandamus with this court.
The duty of the trial judge to alter the normal allocation of peremptory challenges in multiple party cases is set forth in Texas Rule of Civil Procedure 233. In multiple party litigation, upon the motion of a party made prior to the exercise of any peremptory challenges, the court has the duty to equalize the number of peremptory strikes among the sides. Tex.R. Civ. P. 233. In allocating peremptory challenges when multiple litigants are involved on one side of a lawsuit, the trial court must determine whether any of those litigants on the same side are antagonistic with respect to an issue of fact that the jury will decide. Scurlock Oil Co. v. Smithwick, 724 S.W.2d 1, 5 (Tex.1986) (op. on rehg.); Garcia v. Central Power & Light Co., 704 S.W.2d 734, 736 (Tex.1986); Patterson Dental Co. v. Dunn, 592 S.W.2d 914, 918 (Tex.1979); see also Tex.R. Civ. P. 233. If no antagonism exists, each side must receive the same number of strikes. Garcia, 704 S.W.2d at 736; Patterson, 592 S.W.2d at 918.
The existence of antagonism is a question of law that is determined after voir dire and prior to the exercise of the parties' strikes and is based upon information gleaned from pleadings, pretrial discovery, information and representations made during voir dire, and any other information brought to the trial court's attention. Scurlock, 724 S.W.2d at 5; Garcia, 704 S.W.2d at 736-37; Patterson, 592 S.W.2d at 919. However, any error in the trial court's allocation of jury strikes among the parties must be preserved by a timely objection. See In re T.E.T., 603 S.W.2d 793, 798 (Tex.1980); Patterson, 592 S.W.2d at 921; Tex. Commerce Bank Nat'l Ass'n v. Lebco Constructors, Inc., 865 S.W.2d 68, 77 (Tex.App.-Corpus Christi 1993, writ denied), overruled on other *532 grounds by Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 530 (Tex.1998). Generally, the proper time to object to the trial court's allocation of strikes would be at the same time that the determination of antagonism by the trial court should be made  after voir dire and prior to the exercise of the strikes as so allocated by the court. Lebco Constructors, Inc., 865 S.W.2d at 77.
The Texas Supreme Court has recognized that, when defendants have collaborated on the exercise of their peremptory challenges so that no double strikes are made, this factor supports a finding that the defendants have used their ostensibly antagonistic positions unfairly. Lopez v. Foremost Paving, Inc., 709 S.W.2d 643, 645 (Tex.1986). Because, in this instance, the ad litem admitted that he and DFPS had coordinated their strikes in such a manner that they made no double strikes, we hold it was error for the trial court to allow those parties twice as many strikes as appellant. See id.; see also Vargas v. French, 716 S.W.2d 625, 627 (Tex.App.-Corpus Christi 1986, writ ref'd n.r.e.) (noting, after a review of the entire trial record, that there was "no antagonism" between defendants who had coordinated their peremptory challenges resulting in no double strikes).

Preservation of Error
Nonetheless, DFPS insists that, if the trial court erred in allowing the ad litem and DFPS to collaborate in the exercise of peremptory challenges, appellant failed to preserve that error for review because she did not object in a timely manner. See Lebco Constructors, Inc., 865 S.W.2d at 77.
As we have previously stated, in the rule 233 context, the proper time to object to the trial court's allocation of peremptory challenges is at the same time that the determination of antagonism by the trial court should be made  after voir dire and prior to the exercise of the peremptory challenges allocated by the court. Id.; see also Tex.R. Civ. P. 233 However, appellant did not object at that time because she was relying on the ad litem's representation that the ad litem would not exercise any strikes and leave the jury selection up to DFPS and appellant.
This case is similar to the circumstances in Van Allen v. Blackledge, 35 S.W.3d 61 (Tex.App.-Houston [14th Dist.2000, pet. denied]). In Van Allen, prior to jury selection, the trial court held a hearing in chambers to allocate peremptory challenges among the parties. Id. at 64. The trial court ordered the defendants to exercise their strikes independently. Id. The defendants proceeded to exercise their strikes in separate rooms. Id. Immediately after the jury was selected and the panel was seated and sworn, plaintiffs moved for a mistrial on the grounds that the defendants had violated the court's mandate and collaborated in exercising their strikes. Id. The trial court denied their motion. Id. at 65. On appeal, the defendants argued that plaintiffs had waived their objection to the allocation of the strikes because they did not object in a timely manner. Id. The appellate court held that the plaintiffs did not waive their objection under the circumstances because they objected at the earliest possible moment after it became clear that the defendants had coordinated their strikes in violation of the trial court's mandate. Id. at 66-67.
Similarly, appellant objected when it first became apparent that the ad litem had coordinated his strikes with DFPS and that the ad litem planned to use his six strikes after all. After being overruled and after the jury was empaneled and sworn, appellant moved for a mistrial. *533 The trial court held a hearing in which the ad litem admitted that he had told appellant's counsel that he would not exercise any strikes and that he was aligned with the position of DFPS. Under these circumstances, we hold that the appellant did not waive her objection.
Because we hold that under the circumstances, appellant did not waive her objection regarding equalization of peremptory strikes, we must examine whether the trial court's failure to apportion challenges among the parties or grant a mistrial constitutes reversible error.

Harm Analysis
To obtain reversal of a judgment based upon an error in the trial court, the appellant must show that (1) the error occurred; and (2) it probably caused rendition of an improper judgment, or probably prevented the appellant from properly presenting the case to the appellate court. TEX. R. APP. P. 44.1(a); In re D.I.B., 988 S.W.2d 753, 756 & n. 10 (Tex.1999); Tex. Dep't of Human Servs. v. White, 817 S.W.2d 62, 63 (Tex.1991). Once error in the apportionment of peremptory jury challenges has been found, a reversal is required only if the complaining party can show that the trial was materially unfair. See Garcia, 704 S.W.2d at 737 (citing Patterson, 592 S.W.2d at 920). This showing is made from an examination of the entire trial record. Id. If the trial is hotly contested and the evidence sharply conflicting, the error in awarding peremptory challenges results in a materially unfair trial. Id.; see also Lopez, 709 S.W.2d at 644.
A review of the entire record in this case shows that the evidence presented at trial was not sharply conflicting. Regarding facts and history, appellant agreed with the State that she had endangered her other children by exposing them to abusive partners, had a pattern of conduct wherein she relied upon others to provide shelter and money for her, had difficulty maintaining a stable home, had been unable to remain employed for longer than a few months, and had difficulty providing food and medical care for her children when she had them in her custody. She admitted that her rights to her first child were terminated on (D) and (E) grounds in a default judgment because she failed to appear at trial. She also conceded that she relinquished her rights to three other children because she could not care for them and felt that termination was in their best interests. Ultimately, appellant only contests DFPS's conclusion that the evidence of her past conduct indicates that she has no ability to care for M.N.G. in the future. None of the parties dispute the facts regarding appellant's past conduct or her present living situation. Appellant contends that although she has failed as a parent in the past, this time if the child is returned to her it will be different. However, none of the testimony or the evidence in the record indicates that appellant received an unfair trial.
A review of voir dire also does not indicate that appellant was prejudiced by the selection of any of the jurors on the panel. Appellant argued that she would have exercised her strikes more broadly had she known that the ad litem intended to use his strikes in coordination with DFPS. However, the ad litem's intent became clear only when he began to strike venire member number twenty-one. Because appellant exercised her six peremptories under the assumption that the ad litem would not exercise his strikes we begin our review of voir dire starting at venire member number twenty-one. The jury members selected for the panel from the group starting after number twenty-one were venire *534 members numbered twenty-three, twenty-seven, twenty-eight, thirty, and thirty-one.
The potential jurors' answers during voir dire revealed nothing prejudicial about any of the jury members selected from this group. In fact, the jurors selected indicated that they would weigh the evidence carefully. Venire member twenty-three (juror number eight) agreed that just because a parent's rights had been terminated in the past, this did not mean that they could not change over a period of time and that the jury had to look at all the facts. Venire member twenty-seven (juror number nine) asked about the availability of faith-based counseling programs as an option for troubled parents. Along with venire member twenty-eight (juror number ten), venire member twenty-seven (juror number nine) commented on young people having babies and the problems that develop in society because of that.[5] Venire member thirty (juror number eleven) indicated that it would be hard to sit in judgment of a parent when she had no children of her own, but that parents must take responsibility for their actions and the jury must look at all the evidence.
Nothing in the voir dire, however, indicates that the failure to apportion strikes among the parties resulted in a materially unfair trial that caused the rendition of an improper judgment. Therefore, we hold that, although appellant's complaint regarding peremptory challenges was not waived and the trial court erred in failing to allocate peremptory challenges among the parties, any error on the part of the trial court was harmless error and does not require reversal. Appellant's second and third points are overruled.

INEFFECTIVE ASSISTANCE OF COUNSEL
In anticipation that we might overrule appellant's second and third issues for failure to preserve error, appellant's fourth point complains in the alternative that her trial counsel was ineffective for failure to preserve error with respect to the peremptory strike equalization issues. Because we are holding that appellant preserved error regarding her second and third points, appellant's fourth point is moot and we will not address it.[6] Accordingly, appellant's fourth point is overruled.

BURDEN OF PROOF IN PARENTAL RIGHTS TERMINATION CASES
A parent's rights to "the companionship, care, custody and management" of his or her children are constitutional interests "far more precious than any property right." Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that the emotional and physical interests of the child not be sacrificed merely to preserve that right." In re C.H., 89 S.W.3d 17, 26 (Tex.2002). In a termination case, the State seeks not just to limit parental rights but to end them permanently  to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX. FAM. CODE ANN. § 161.206(b) (Vernon Supp.2004); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.1985).
*535 In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001; Richardson v. Green, 677 S.W.2d 497, 499 (Tex.1984); Swate v. Swate, 72 S.W.3d 763, 766 (Tex.App.-Waco 2002, pet. denied). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987).
Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by "clear and convincing evidence." TEX. FAM. CODE ANN. §§ 161.001, 161.206(a); In re G.M., 596 S.W.2d 846, 847 (Tex.1980). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. G.M., 596 S.W.2d at 847; In re D.T., 34 S.W.3d 625, 630 (Tex.App.-Fort Worth 2001, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam.Code Ann. § 101.007 (Vernon 2002).

LEGAL SUFFICIENCY
In her sixth and seventh points, appellant argues that the evidence is legally insufficient to support termination under sections 161.001(1)(D) and (E) of the family code.

Legal Sufficiency Standard of Review
The higher burden of proof in termination cases alters the appellate standard of legal sufficiency review. In re J.F.C., 96 S.W.3d 256, 264 (Tex.2002). The traditional no-evidence standard does not adequately protect the parent's constitutional interests. Id. In reviewing the evidence for legal sufficiency in parental termination cases, we must determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction" that the grounds for termination were proven. Id. We must review all the evidence in the light most favorable to the finding and judgment. Id. at 266. This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. Id. We must also disregard all evidence that a reasonable factfinder could have disbelieved. Id. We must, however, consider undisputed evidence even if it does not support the finding. Id.

161.001(1)(E) Evidence Regarding Endangering Course of Conduct
We first review appellant's seventh point, where she complains that the evidence is legally insufficient to support the jury's finding that she engaged in conduct or knowingly placed M.N.G. with persons who engaged in conduct that endangered M.N.G.'s physical or emotional well-being. See Tex. Fam.Code Ann. § 161.001(1)(E). Appellant contends that termination was not proper based on section 161.001(1)(E) because she never had custody of M.N.G. at any time after her birth other than one hour of supervised visitation per week. Moreover, she maintains that her prior conduct, occurring before M.N.G.'s birth, does not constitute sufficient evidence to establish an endangering course of conduct. DFPS maintains, however, that appellant's history of *536 routinely relying on third persons to provide support and shelter for her and her children puts M.N.G. at risk of homelessness, neglect, and abuse if M.N.G. is to be returned to appellant's care. DFPS contends that appellant's history clearly demonstrates an endangering course of conduct that posed both physical and emotional danger to M.N.G.'s well-being.
Under section 161.001(1)(E) of the Texas Family Code, the term "endanger" means to expose to loss or injury, to jeopardize. Tex. Fam.Code Ann. § 161.001(1)(E); Boyd, 727 S.W.2d at 533. Accordingly, when analyzing a jury's findings pursuant to subsection (E), we must determine whether sufficient evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. In re D.M., 58 S.W.3d 801, 811-12 (Tex.App.-Fort Worth 2001, not pet.). Termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. Tex. Fam.Code Ann. § 161.001(1)(E); D.T., 34 S.W.3d at 634; In re K.M.M., 993 S.W.2d 225, 228 (Tex.App.-Eastland 1999, no pet.). However, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. Boyd, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. Id.
To determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. D.M., 58 S.W.3d at 812. Consequently, scienter is only required under subsection (E) when a parent places the child with others who engage in an endangering course of conduct. In re U.P., 105 S.W.3d 222, 236 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (op. on reh'g). As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. In re S.D., 980 S.W.2d 758, 763 (Tex.App.-San Antonio 1998, pet. denied).
DFPS and appellant both presented evidence of appellant's past conduct regarding her five children. We begin with appellant's first child, H.W. He was first removed from her care after appellant took him to the hospital and did not return to pick him up. DFPS was also concerned about H.W. because appellant's boyfriend, H.W.'s father, abused drugs and because H.W. appeared malnourished. At M.N.G.'s trial, appellant admitted that her relationship with H.W.'s father was abusive and controlling. Appellant did not show up at H.W.'s termination hearing, and the court rendered a judgment against her terminating her parental rights to H.W. on grounds of endangerment by conduct and by environment, and abandonment in 1990.
Shortly after the termination regarding H.W., appellant went to Oklahoma. There she met Donald, whom she married. Soon, appellant became pregnant with D.H. Appellant testified at M.N.G.'s trial that Donald was violent and physically abused her, even during her pregnancy. She gave birth to D.H. in 1991, and remained in the abusive relationship with Donald until D.H. was almost a year old. Although she remained married to Donald, appellant eventually moved back to Texas and was living with her sister when she met Eugene.
Within six months, appellant moved in with Eugene at his older sister's house for a few weeks. Eventually, the couple moved in with Eugene's mother because Eugene was having trouble with the police. At this point, appellant conceded that she saw a pattern developing wherein she *537 would go from one abusive relationship to another seeking someone to support her and D.H. By the time appellant moved into Eugene's mother's house, she had given birth to Eugene's first child M.H. in 1992; L.H. was born in 1995. Appellant testified that she was not allowed to use the phone or leave the house, and at times she and the children were locked inside the home to prevent them from leaving. Appellant did not work, and the family supported itself with sporadic income from Eugene, food stamps, Medicaid, and AFDC. Eugene routinely abused D.H. by hitting him with a plastic pipe and by depriving him of food. Appellant remained in this situation with her children for six years because Eugene told appellant he would kill himself if she left.
In 1998, DFPS received a referral on D.H. alleging physical neglect. When the DFPS investigator first arrived at appellant's home, a female inside the home threatened to shoot her. The investigator returned with the police. The house was very small with a dirt floor; feces were all over the walls; and a chain was on the refrigerator. Eight dogs, two cats, four adults, and three children lived in the house.
The investigator first spoke to D.H. out in the yard. He was seven years old, his hair was thinning, he limped, he was dirty and malnourished. D.H. had difficulty talking and was unable to form full sentences. However, he was able to tell the investigator that his father regularly hit him with a stick, he had been bitten by a rat, and was hungry because he received only two meals a day while the other children received three. Appellant lied to the investigator, was not forthcoming about her history, and told her that Eugene was not in the house. When the investigator discovered Eugene in the house, she confronted appellant and appellant became more forthcoming. Appellant told the investigator she was afraid of Eugene, but that she took good care of her children and did not know why D.H. drank out of the toilet when he was at school.[7]
The home was condemned, and DFPS took appellant and her three children to a shelter. Appellant agreed with the safety plan proposed by DFPS, which required that Eugene not come to the shelter. However, the shelter called DFPS that night and told them that appellant had allowed Eugene to come to the shelter. DFPS took D.H. to the hospital for evaluation of his developmental and behavioral problems, and the doctors eventually placed him in a residential treatment facility in San Antonio. DFPS placed M.H. and L.H. in foster care.
Next, a DFPS Intensive Family Reunification Unit worker began working with appellant to place M.H. and L.H. back in appellant's home from foster care. Because of his behavioral and mental problems, D.H. remained in the residential treatment center. Appellant lived in section eight subsidized housing when the children came home to live with her in May 2000. From the beginning, appellant struggled to keep enough food in the house to feed the children. In June 2000, appellant began to struggle with employment problems. She lost her job and could not pay rent; she found another job, but lost it a month later, and finally found another in August. DFPS arranged for a charity to pay part of her rent in June and helped her with canned food and transportation *538 and in applying for food stamps and Medicaid. However, appellant never followed through with her applications or appointments for services like food stamps and Medicaid.
In September 2000, appellant was evicted from her apartment for nonpayment of rent and she and her children went to live at the Salvation Army shelter in the family program. The program required residents to keep their apartments clean and actively look for work. Appellant did not comply with the requirements, and the Salvation Army evicted them from the shelter in October. DFPS took the children back into foster care and appellant began living with a man named Tim on the street, under a freeway overpass.
In December 2000, while living on the street, appellant discovered that she was pregnant again. At the time, she believed that Tim was the father. M.N.G. was born on May 24, 2001, while termination proceedings were pending regarding D.H., M.H., and L.H. DFPS received a referral regarding M.N.G. right after the birth alleging that appellant had drugs in her system. The allegations were false, but DFPS sought removal of M.N.G. anyway and placed her in foster care directly from the hospital. The police arrested Tim shortly after the birth, leaving appellant in a motel, unemployed, and with no means to support herself.
Since then, appellant has lived in many different places. First, she moved in with Tim's daughter in Amarillo from June 2001 to August 2001. Next, she lived with a friend in Fort Worth until April 2002. After that, appellant got an apartment of her own for a few months. When that did not work out, she moved in with her new boyfriend (who later became her fiancé) and his mother in Granbury.
Meanwhile, DNA testing revealed that Tim was not M.N.G.'s father. Appellant named another man she met while living at the shelter to be the possible biological father of M.N.G. In addition to her unstable housing situation, appellant also failed to obtain and maintain stable employment pursuant to the DFPS service plan. From May of 2001 through trial in the spring of 2003, appellant was either unemployed or worked for brief periods at a convenience store in Amarillo (two months), Diamond Shamrock, Wendy's, Jack-in-the-Box, McDonald's (one month) and at the Texas Workforce Commission.
At the time of trial, appellant was still living with her fiancé's mother in Granbury. She claimed that her living situation had stabilized now that she was living with her fiancé and his mother.[8] Appellant contended that she had a lawn business given to her by her fiancé; however, she admitted that she did not know how to mow lawns herself, could not drive, and did not have a car. She relied on her fiancé for transportation. According to a financial budget admitted at trial, her income consisted of her fiancé's disability payments, food stamps, projected future income from the lawn service, and income from a job that she had not even started. Appellant admitted at trial that she had a poor pattern of choosing abusive men and exposing her children to them. She conceded that she had opportunities to break out of this pattern and chose not to.
Overall, the evidence showed that appellant consistently endangered her children by exposing them to abusive partners, had a pattern of relying on others to provide shelter and money for her, had difficulty maintaining a stable home, had been unable to remain employed for longer than a *539 few months, and had difficulty providing food and medical care for her children when she had them in her custody. This evidence is such that a factfinder could reasonably form a fair belief or conviction that the grounds for termination were proven. Based upon this evidence, we hold that the evidence is legally sufficient to support the jury's finding that appellant engaged in conduct that endangered M.N.G.'s physical or emotional well-being. We overrule appellant's seventh point.

FACTUAL SUFFICIENCY AND BEST INTEREST
In her fifth point, appellant contends that the evidence is factually insufficient to support the trial court's finding that termination of the parent-child relationship was in the child's best interest. The higher burden of proof in termination cases also alters the appellate standard of factual sufficiency review. C.H., 89 S.W.3d at 25. "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." Id. In considering whether the evidence of termination rises to the level of being clear and convincing, we must determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction" that the grounds for termination were proven. Id. Our inquiry here is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent's parental rights would be in the best interest of the child. See id. at 28; In re W.C., 98 S.W.3d 753, 757 (Tex.App.-Fort Worth 2003, no pet.).
Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:
(1) the desires of the child;
(2) the emotional and physical needs of the child now and in the future;
(3) the emotional and physical danger to the child now and in the future;
(4) the parental abilities of the individuals seeking custody;
(5) the programs available to assist these individuals to promote the best interest of the child;
(6) the plans for the child by these individuals or by the agency seeking custody;
(7) the stability of the home or proposed placement;
(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and
(9) any excuse for the acts or omissions of the parent.
Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.1976). These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. C.H., 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. Id. On the other hand, the presence of scant evidence relevant to each Holley factor will not support such a finding. Id.
After reviewing the evidence, it is clear that appellant lacks fundamental parenting skills. She has consistently refused to comply with DFPS service plans requiring that she obtain and maintain stable housing and employment. Appellant continues to repeat her established pattern of living with men so that they may provide her with support, housing, and transportation. She is unable to hold a job for more than a few months and has never shown that she is able to provide for even the *540 most basic needs of her children. Additionally, she concedes that obtaining full custody of M.N.G. may not be in the best interest of the child, but argues that the court should not terminate her parental rights, but leave M.N.G. in foster care until she is eighteen and allow appellant visitation rights. However, Stephanie Duren, a DFPS caseworker assigned to appellant, testified that this solution does not provide M.N.G. with stability and is more appropriate for situations where the child has a medical problem that a natural parent cannot handle alone. M.N.G. has no such medical condition.
Appellant argues that her home is now stable, but the evidence presented shows only a tenuous stability at best. Appellant is still relying on support from a third party and little stands between appellant and homelessness if the relationship were to suddenly fail. We must conclude that the jury could reasonably form a firm conviction that termination of appellant's rights would be in M.N.G.'s best interest. Accordingly, we hold that factually sufficient evidence exists to support the jury's finding that termination of appellant's parental rights to M.N.G. is in the child's best interest. We overrule appellant's fifth point.[9]

EX POST FACTO LAW
In appellant's eighth point, she complains that, as applied to her, section 161.001(1)(M) of the family code is an ex post facto and retroactive law that violates the Texas Constitution. Section 161.001(1)(M) of the family code allows termination of parental rights regarding one child because the parental rights to another child have been terminated. Tex. Fam.Code Ann. § 161.001(1)(M). She argues that section 161.001(1)(M) did not exist when her rights to H.W. were terminated; therefore, it is unconstitutional to terminate her rights to M.N.G. on this ground. Because we have already held that the evidence was legally and factually sufficient to terminate appellant's parental rights under family code section 161.001(1)(E) and 161.001(2) we need not address this point. See Tex.R.App. P. 47.1.

CONCLUSION
Having overruled all of appellant's points, we affirm the trial court's judgment.
WALKER, J. filed a dissenting opinion.
SUE WALKER, Justice, dissenting on rehearing.
I respectfully dissent. Chapter 263 of the Texas Family Code sets forth several provisions the Department of Family Protective Services (DFPS) may invoke to maintain temporary conservatorship of a child beyond subsection 263.401(a)'s one-year period and thereby avoid dismissal of its termination suit. See Tex. Fam.Code Ann. § 263.403(a)(1)-(4) (Vernon 2002). DFPS did not utilize these provisions. Instead, DFPS chose to abandon and to immediately refile its suit seeking termination of M.N.G.'s mother's parental rights, obtaining temporary conservatorship of M.N.G. in the refiled suit based on the same facts pleaded to initially remove M.N.G. from her mother. Because DFPS alleged no new grounds supporting its second  although really continuous  removal of M.N.G. from her mother and its *541 second  although really continuous  appointment as temporary managing conservator of M.N.G., the trial court was required to dismiss this termination suit. See TEX. FAM.CODE ANN. § 263.401(a); In re T.M., 33 S.W.3d 341, 348 (Tex.App.-Amarillo 2000, pet. filed); In re Ruiz, 16 S.W.3d 921, 927-28 (Tex.App.-Waco 2000, no pet.). Accordingly, I would sustain Appellant's first issue and reverse the trial court's judgment.
NOTES
[1] While we agree, as the dissent has pointed out, that the procedural history of all the cases involving M.N.G. have at least violated the spirit and objective of section 263 of the Texas Family Code, we cannot agree that the time periods in the other cases can automatically be tacked onto the time periods from prior temporary orders appointing DFPS to create a violation of section 263.401. See Tex. Fam.Code Ann. § 263.401(a). The statute, unfortunate as it may be, fails to provide a method of aggregating time periods of other cases. Since this case is the only case of the four cases involving M.N.G. that has been appealed and its final order was entered before the first anniversary of its temporary order appointing DFPS (April 5, 2002), we cannot agree that the trial court erred in failing to dismiss it. See Tex. Fam.Code Ann. § 263.401. The failure to dismiss any of the prior cases was a procedural error not a jurisdictional one that appellant should have attacked by mandamus or appeal in those cases. See In re J.M.C., 109 S.W.3d 591, 595 (Tex.App.-Fort Worth 2003, no pet.); In re J.B.W., 99 S.W.3d 218, 222-24 (Tex.App.-Fort Worth 2003, pet. denied). This case is the only one that appellant challenged by mandamus or by appeal.
[2] For the purposes of section 263.401, a final order is one that:

(1) requires that a child be returned to the child's parent;
(2) names a relative of the child or another person as the child's managing conservator;
(3) without terminating the parent-child relationship, appoints the department as the managing conservator of the child; or
(4) terminates the parent-child relationship and appoints a relative of the child, another suitable person, or the department as managing conservator of the child.
Tex. Fam.Code Ann. § 263.401(d).
[3] The trial court severed DFPS's initial termination suit out of cause number XXX-XXXXXJ-00 into cause number XXX-XXXXXJ-01, which DFPS abandoned with the filing of its April 5, 2002 petition.
[4] In its decree of termination regarding H.W., the trial court found that appellant had

Voluntarily left the child alone or in the possession of another not the parent and expressed an intent not to return; and Knowingly placed and knowingly allowed the child to remain in conditions and surroundings which endangered the physical and emotional well-being of the child; and Engaged in conduct and knowingly placed the child with persons who engaged in conduct which endangered the physical and emotional well-being of the child.
Compare Act of May 24, 1989, 71st Leg., R.S., ch. 808, § 1, 1989 Tex. Gen. Laws 3673, 3673 (former Tex. Fam.Code Ann. § 15.02), repealed by Act of April 6, 1995, 74th Leg., R.S., ch. 20, §§ 1, 2, 1995 Tex. Gen. Laws 113, 212, 282, with Tex. Fam.Code Ann. § 161.001(1)(A), (D), (E) (Vernon 2002) (providing for involuntary termination of parental rights if the parent has
(A) voluntarily left the child alone or in the possession of another not the parent and expressed an intent not to return;
(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [or]
(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child).
[5] These comments were not directed specifically at appellant who was thirty-five-years-old at the time of the trial.
[6] See Tex.R.App. P. 47.1.
[7] Although this incident occurred at school, D.H. was seven and had never been permanently enrolled at a school. Appellant had tried to enroll him twice, but the first time the school was out of the district and the second time the school could not keep him because of his behavioral problems.
[8] At trial, appellant was still married to Donald because she did not have enough money to file for divorce, but she had not seen him for twelve years.
[9] Because we hold that there was sufficient evidence to support the jury's findings under family code section 161.001(1)(E) and that termination was in the child's best interest under section 161.001(2) we need not address appellant's sixth point complaining of legal insufficiency under section 161.001(1)(D). See In re S.F., 32 S.W.3d 318, 320 (Tex.App.-San Antonio 2000, no pet.).