

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-12-00001-CV

IN THE INTEREST OF A.V.,
A CHILD

----------

FROM THE 325TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

The sole issue raised in this appeal from a judgment terminating Mother's parental rights to her daughter A.V. is whether the evidence is factually sufficient to show that termination was in A.V.'s best interest. We will affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. FACTUAL AND PROCEDURAL BACKGROUND

A.V. was born September 3, 2006, while Mother was in jail. Mother requested that A.V. be placed with her grandmother, Mary.[2] On December 21, 2007, Mary was appointed as the nonparent sole managing conservator of A.V. in a suit that did not involve CPS. After Mother's release from jail, Elizabeth Pratt, a CPS investigator, testified that she was assigned to investigate A.V.'s case because Mother had made a referral, stating that she believed that A.V. was at risk because Mary was using methamphetamine and was not allowing Mother access to A.V.

Pratt interviewed Mother on November 17, 2010. Mother reported that Mary was using methamphetamine and that she had heard that Mary had been seen at Wal-Mart selling drugs and acting erratically. Mother admitted to Pratt that she had been a drug user since she was a teenager, that she had been charged several times with prostitution and possession of cocaine, that she had used methamphetamine with Mary both before and after Mother was incarcerated, that she had used drugs up until two weeks before she met with Pratt, and that she had seen Mary sell drugs and had observed her making large bank deposits with money from drug sales. Mother told Pratt that she had placed A.V. with Mary because she felt that Mary's drug use would allow her more contact with A.V.

---

[2]An alias is used to ensure anonymity. *See generally* Tex. R. App. P. 9.8.

On November 18, 2010, Pratt met with Mary at her house and discussed the allegations of drug use. Pratt asked Mary to take a drug test, and she tested positive for methamphetamine. Mary thereafter agreed to place A.V. with the child's paternal great-grandmother. Mary signed an agreement that she would not have unsupervised contact with A.V., but Mary violated the agreement.

Pratt said that she assessed whether A.V. could be placed with Mother and decided that Mother was not a good option because she had admitted using drugs during the month and did not have a stable living environment.[3] Mother and her partner both signed acknowledgement of substance use forms, stating that they had used methamphetamine and marijuana on November 3, 2010. CPS thereafter placed A.V. in foster care.

Julie Weldon, a CPS caseworker, was assigned to A.V.'s case in May 2011.[4] Weldon testified that Mother had completed the CATS outpatient drug treatment facility program on February 21, 2011. Mother had been successfully discharged from individual therapy at Positive Influences on April 12, 2011, and had participated in random drug testing with no positive drug tests. Weldon testified that at the time she was assigned to the case, Mother was maintaining a safe and appropriate home environment for A.V., and Mother was maintaining

---

[3]Pratt also testified that Mother had a previous CPS case involving physical and medical neglect; the name of the child involved was not given.

[4]A caseworker named Tamesha Sowell was assigned to the case after Pratt and before Weldon, but Sowell was no longer with CPS at the time of the termination trial and did not testify.

contact with the CPS caseworker. Weldon testified that because Mother was doing everything that CPS asked of her,[5] CPS's plan as of May 2011 was a monitored return of A.V. to Mother.

So in June 2011, after Mother took and passed a drug test, CPS allowed Mother unsupervised visits overnight with A.V. from June 9 through 12, June 20 through 22, June 27 through 29, and July 1 through 5. During the unsupervised visits, there was to be no contact with Mary so that Mother could bond with A.V. and also because Mary had continued to use methamphetamine.[6]

Following the four successful unsupervised visits, CPS's plan was for A.V. to stay with Mother beginning July 11 through the July 14 court date because CPS believed that the trial court would grant a monitored return. On July 11, Weldon picked up A.V., along with all of her belongings, from her foster parents' home. A.V. was "a little hesitant" but was happy to be going to Mother's home. When Weldon arrived at Mother's home, she knocked on the door several times, as well as on the windows, but there was no answer. Weldon called and texted Mother and her partner but received no response. Weldon finally reached Mother for a few seconds, but then the phone disconnected, and Weldon was

---

[5]But Weldon later testified that she had asked Mother to seek employment, to attend Narcotics Anonymous meetings on a regular basis, and to get an education through the adult literacy programs in the area and that Mother did not follow through on these requests.

[6]The rule of no contact with Mary was violated on one occasion when Mother accidentally ran into Mary in public.

unable to get in touch with Mother after that. Weldon ultimately took A.V. back to her foster home; A.V. acted out after the monitored return fell through.

Weldon testified at the termination trial on December 1, 2011, that Mother had been missing since July 11, 2011. Mother had left Weldon a message on October 20,[7] but Weldon had been unable to reach Mother on October 25 and never heard from Mother again. Weldon did not know where Mother was living.

Weldon testified that Mother could not meet the present or future educational, emotional, or medical needs of A.V. Weldon also did not believe that Mother could provide a safe environment, food, clothing, or shelter for A.V. at the time of the termination trial or in the future.

Weldon therefore asked the trial court to terminate Mother's parental rights to A.V. because termination of Mother's parental rights to A.V. was in A.V.'s best interest. The Department also asked that Mary be removed as managing conservator and that the Department be named as managing conservator with the authority to place A.V. for adoption. The Department planned for A.V. to be adopted by a family other than her foster family.[8]

After hearing the testimony, the trial court found by clear and convincing evidence that grounds for termination had been proper and that termination of

---

[7]In the October 20 message, Mother mentioned Weldon, gave her name and phone number, and asked Weldon to call her back.

[8]A.V.'s foster family had placed A.V. with a respite family for a week while another foster child had brain surgery; the respite family "fell in love" with A.V. and inquired about adopting her.

the parent-child relationship between Mother and A.V. was in A.V.'s best interest. This appeal followed.

### III. FACTUALLY SUFFICIENT EVIDENCE EXISTS TO SUPPORT BEST INTEREST FINDING

In her sole issue, Mother argues that the evidence is factually insufficient to support the best interest finding because there was evidence that she had made so much progress during the case.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2011); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008).

Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

6

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the best interest of the child;

(F) the plans for the child by these individuals or by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).[9]

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

Here, the forty-seven-page reporter's record does not reveal five-year-old A.V.'s preferences. There was some evidence that A.V. was "a little hesitant" but

---

[9]Because neither Mother nor the Department analyzes the section 263.307(b) factors but instead focus only on the *Holley* factors in their briefs, we will analyze the evidence pertaining to the best interest finding under the *Holley* factors as well.

7

was happy to be going to Mother's home when Weldon attempted to drop her off on July 11. The record did not demonstrate whether A.V. felt differently at the time of the termination trial after not having seen Mother for almost five months. The trial court was entitled to find that this factor weighed slightly in favor of termination.

The record also does not set forth the specific present and future emotional and physical needs of A.V., other than that she takes medication for ADHD. The record does, however, contain Weldon's testimony that Mother could not meet the educational, emotional, or medical needs of A.V. at the time of the termination trial or in the future and that Mother could not provide a safe environment, food, clothing, or shelter for A.V. at trial or in the future because Mother's whereabouts were unknown at trial. The trial court was entitled to find that this factor weighed in favor of termination.

The main emotional and physical danger to A.V. at trial and in the future was abandonment by Mother. During Mother's visits, A.V. was confused, prompting the exclusion of Mary from Mother's unsupervised visits to allow Mother to bond with A.V. Moreover, A.V. acted out when the monitored return fell through after multiple unsupervised home visits. Another physical danger supported by the record was Mother's placement of A.V. with a known drug user—Mary—raising a question of whether Mother would properly protect A.V. The trial court was entitled to find that this factor weighed in favor of termination.

8

With regard to Mother's parental abilities, the record reveals a rollercoaster pattern. Mother initially placed A.V. with a known drug user because Mother gave birth to A.V. while in jail. Mother's CPS history included a previous CPS case involving physical and medical neglect. Mother's criminal history included convictions for prostitution and possession of cocaine. Mother then found a partner who would provide stable housing, attempted to clean up her act by working services, and bonded with A.V. through visits, including unsupervised visits. However, because Mother failed to secure employment and was dependent upon her partner for housing and all of life's necessities, Mother's ability to provide for A.V. vanished when the relationship with her partner allegedly ended near the time of the attempted monitored return. Moreover, Mother's unexplained disappearance through the time of trial raised questions regarding her parenting abilities. The trial court was entitled to find that this factor weighed in favor of termination.

The record lacks any information regarding the programs available to assist Mother in promoting A.V.'s best interest.

Because Mother had not been located at trial, her plans for A.V. were unknown. The Department's plan for A.V. was adoption by the respite family who had cared for her while she was away from her foster home. The trial court was entitled to find that this factor weighed in favor of termination.

Although Mother had previously shown the ability to provide a stable home, Mother's residence and whereabouts were unknown at the time of the

9

termination trial. The record did not contain information regarding the stability of the prospective adoptive family's home.

In addition to Mother's prior drug use and her decision to place A.V. with Mary, the main act or omission of Mother that may have indicated to the trial court that the existing parent-child relationship was not a proper one was Mother's unexplained disappearance. By failing to show up on July 11 to accept A.V. for the monitored return, by failing thereafter to return Weldon's calls for three months, and by failing to keep the Department apprised of her whereabouts, Mother missed out on the opportunity to be reunited with A.V. The Department attempted to give Mother what she now requests, but Mother disappeared, and her whereabouts remain unknown. The trial court was entitled to find that this factor weighed in favor of termination.

Giving due deference to the factfinder's findings, without supplanting the judgment with our own, and after reviewing the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that termination of the parent-child relationship between Mother and A.V. is in A.V.'s best interest. *See In re M.N.G.,* 147 S.W.3d 521, 539–40 (Tex. App.—Fort Worth 2004, pet. denied) (holding evidence factually sufficient to support best interest finding because Mother lacked fundamental parenting skills and refused to obtain and maintain stable housing and employment). We overrule Mother's sole issue.

## IV. Conclusion

Having overruled Mother's sole issue, we affirm the trial court's judgment terminating Mother's parental rights to A.V.

PER CURIAM

PANEL:  WALKER, DAUPHINOT, and GARDNER, JJ.

DELIVERED:  June 7, 2012