

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-15-00152-CV

IN THE INTEREST OF C.Y., THE
CHILD

----------

FROM THE 16TH DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. 2013-10913-16

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

C.Y. was born in November 2013. Three days after her birth, the
Department of Family and Protective Services (DFPS) took possession of C.Y.,

---

[1]*See* Tex. R. App. P. 47.4.

*see* Tex. Fam. Code Ann. § 262.104 (West 2014),[2] and placed her with a foster family while DNA tests were conducted on the potential fathers. Three months later, after a court-ordered DNA test confirmed Appellant to be C.Y.'s father, the trial court adjudicated him as C.Y.'s father, made him a temporary possessory conservator of the child, and issued orders requiring him to complete various services before C.Y. could be placed with him.

During the fourteen-month interim before trial, Appellant completed some but not all of the services that he was ordered to perform. At the end of a week-long jury trial in April 2015, the trial court entered judgment on the jury's findings, terminating Appellant's parental rights as to C.Y.:

> Based upon the jury's verdict and the evidence submitted at trial, the Court finds by clear and convincing evidence that termination of the parent-child relationship between [Appellant] and the child the subject of this suit, [C.Y.], is in the child's best interest.
>
> The Court finds by clear and convincing evidence that [Appellant] has:
>
> - failed to comply with the provisions of a Court order that specifically established the actions necessary for the father to obtain the return of the child, [C.Y.], who ha[s] been in the temporary managing conservatorship of [DFPS] for not less than nine months as a result of the child['s] removal from the parent under Chapter 262 for the abuse or neglect of the child.

---

[2]DFPS removed C.Y. from her mother because C.Y.'s meconium had tested positive for a marijuana metabolite. C.Y.'s mother had a history with DFPS—her parental rights had been terminated as to two older children by the time C.Y. was born—and she had a history of unsafe relationships, substance abuse, and mental-health issues. She admitted to using alcohol, marijuana, and K2 while pregnant with C.Y., and after C.Y.'s birth, she voluntarily relinquished her parental rights.

2

*See* Act of Mar. 30, 2015, 84th Leg., R.S., ch. 1, § 1.078, sec. 161.001(b), 2015 Tex. Sess. Law Serv. 18, 18–20 (West) (to be codified as an amendment to Tex. Fam. Code Ann. § 161.001) (hereinafter cited as Tex. Fam. Code Ann. § 161.001(b)).   In three issues, Appellant now appeals the termination of his parental rights to C.Y.  We affirm.

## II.  Termination of Parental Rights

### A.  Standard of Review

The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the termination is in the child's best interest and the parent has

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of [DFPS] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

*Id.* § 161.001(b)(1)(O), (2); *see also id.* § 263.106 (West 2014) (stating that after reviewing the original and any amended service plan and making any changes or modifications it deems necessary, the court shall incorporate the original and any amended service plan into the orders of the court and may render additional appropriate orders to implement or require compliance with an original or amended service plan).

In his second and third issues, Appellant complains that the evidence was legally and factually insufficient to terminate his parental rights under subsection

3

O and that the requirements for the unequivocal warning to parents required for termination under that subsection were not met.

## B. Preservation

In order to preserve a legal sufficiency challenge on appeal following a jury trial, Appellant must raise the challenge with the trial court in one of the following ways: (1) a motion for instructed verdict; (2) a motion for judgment notwithstanding the verdict (JNOV); (3) an objection to the submission of the question to the jury; (4) a motion to disregard the jury's answer to a vital fact question; or (5) a motion for new trial. *In re D.J.J.*, 178 S.W.3d 424, 426–27 (Tex. App.—Fort Worth 2005, no pet.); *see also* Tex. R. Civ. P. 324(b) (listing appellate complaints that must be preserved by a motion for new trial); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220–21 (Tex. 1992). After a jury trial, factual sufficiency challenges must be raised in a motion for new trial. Tex. R. Civ. P. 324(b)(2)–(3); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).

Further, the rule of appellate procedure that governs preserving complaints for appellate review generally requires a party to present to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a). If a party fails to do this, error is not preserved, and the complaint is waived. *See Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g).

The complaint on appeal must be the same as that presented in the trial court. *See Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997). An appellate court cannot reverse based on a complaint not raised in the trial court. *Id.*; *see Pat Baker Co. v. Wilson*, 971 S.W.2d 447, 450 (Tex. 1998); *see also* Tex. R. App. P. 53.2(f); *Sonat Exploration Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 236 (Tex. 2008); *In re J.T.*, No. 02-14-00378-CV, 2015 WL 2345511, at *2 (Tex. App.—Fort Worth May 14, 2015, no pet.) (mem. op.) (concluding that because mother's express appellate issue did not comport with her complaint in the trial court, she had failed to preserve it for review).

Appellant argues in his second issue that the evidence is legally and factually insufficient to support termination under subsection O because the trial court never made the findings required under Chapter 262 with regard to him.

Jury Question 3, on which the jury based its subsection O finding, stated:

> Do you find by clear and convincing evidence that the Father, [Appellant], failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child, [C.Y.], who has been in the temporary managing conservatorship of [DFPS] for not less than nine months as a result of the child's removal from the parent for abuse or neglect?

At the charge conference during trial, Appellant's counsel made the following objection regarding Question 3:

> Moving on to Question No. 3. On behalf of [Appellant] we object to it[]s inclusion in the Charge for the following reasons: We believe no order has been submitted into evidence that unequivocally tells [Appellant] what he must do to get return of the child [C.Y.].

5

In addition, we believe if this is submitted it will cause a denial of the due process rights of [Appellant] and that it will be an ambiguous order in which it says, you maybe lose your child or maybe you don't lose your child, leaving up to the Court's potential [sic] would be where the statute says it must be in [an] unequivocal order what he must do.

We object to their Question No. 3 being submitted to the jury at all.

Appellant did not file a motion for instructed verdict, a motion for JNOV, a motion to disregard the jury's answer to Question 3, or a motion for new trial raising the sufficiency of the evidence—factual or legal—to support subsection O with regard to this or any other issue. *See* Tex. R. Civ. P. 324(b); *D.J.J.*, 178 S.W.3d at 426–27. And although Appellant objected to Question 3's inclusion in the jury charge, his objection did not comport with the argument he now makes on appeal.[3] *See Banda*, 955 S.W.2d at 272; *J.T.*, 2015 WL 2345511, at *2.

---

[3]Appellant complains that the only chapter 262 finding that the trial court made was as to the child's mother and that the trial court never made any findings that the child was removed under chapter 262 due to any abuse or neglect by him. But there was nothing in his charge-conference objection to make the trial court plainly aware of this complaint when he only notified the trial court of his position that he had no duty to obey the orders that were issued and not that the evidence was insufficient as to subsection O's statutory requirements. Further, we note that the parent who fails to comply with a court order as required by subsection O need not be the same person whose abuse or neglect triggered the child's removal. *In re D.R.J.*, 395 S.W.3d 316, 320 (Tex. App.—Fort Worth 2013, no pet.); *In re D.R.A.*, 374 S.W.3d 528, 532 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see In re S.N.*, 287 S.W.3d 183, 188 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (op. on reh'g) ("Had the legislature intended such a requirement, it could have easily provided that conservatorship be 'as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child *by the parent*.'"). There is no dispute that by the time of the April 2015 trial, C.Y. had been in DFPS's temporary managing conservatorship for over nine months as a result of her removal from her mother

Therefore, Appellant has failed to preserve this complaint for our review, and we overrule his second issue. *See In re J.V.*, No. 02-15-00036-CV, 2015 WL 4148500, at \*1–2 (Tex. App.—Fort Worth July 9, 2015, no pet.) (mem. op.) (overruling father's legal sufficiency complaint on best interest for lack of preservation when he did not make or file any of the required motions or object to the charge on the legal sufficiency of the evidence to support submission of the best-interest instruction and overruling his factual sufficiency complaints as to jury's findings when he failed to preserve these by filing a motion for new trial); *In re G.H.*, No. 02-14-00261-CV, 2015 WL 3827703, at \*5 (Tex. App.—Fort Worth June 18, 2015, no pet.) (en banc mem. op. on reh'g) ("Because Mother did not raise her legal sufficiency challenge in the trial court, she has not preserved that complaint."); *In re A.J.L.*, 136 S.W.3d 293, 301 (Tex. App.—Fort Worth 2004, no pet.) (holding that mother waived factual sufficiency complaints as to jury findings by failing to file a motion for new trial); *In re S.R.C.*, No. 02-02-00426-CV, 2003 WL 22966325, at \*2 (Tex. App.—Fort Worth Dec. 18, 2003, no pet.) (mem. op.) (holding that mother waived her jury-charge points when she made no objection to the jury charge on a basis that comported with her points); *see also* Tex. R. Civ. P. 274 (stating that a party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection and that any complaint as

---

under Chapter 262 for abuse or neglect. *See D.R.A.*, 374 S.W.3d at 532 (stating that it was irrelevant that the father was not the parent who had abused or neglected the child, warranting the child's removal under subsection O).

7

to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections); *In re B.L.D.*, 113 S.W.3d 340, 350, 354 (Tex. 2003) (stating that procedural rules require that any complaint to a jury charge is waived unless specifically included in an objection and concluding that due process does not require appellate review of unpreserved complaints in termination-of-parental-rights cases), *cert. denied*, 541 U.S. 945 (2004).

## C. Unequivocal Warning Under Subsection O

In his third issue, Appellant argues that subsection O's "unequivocal warning" requirement was not met, contending that the service plan[4] provided to him never affirmatively stated that the completion of the actions listed in the plan were a necessary requirement for the child's return. But the trial court incorporated the requirements of Appellant's family service plan into its March 13, 2014 order adjudicating C.Y.'s parentage. The March 13, 2014 order stated, in bold and in a larger font to set it off from the surrounding text, "**The Court finds and hereby notifies the parents that each of the actions**

---

[4]The statutory language of subsection O, as set out in this opinion, does not mention "service plan" and instead refers to "the provisions of a court order." Tex. Fam. Code Ann. § 161.001(1)(b)(O). The trial court admitted into evidence the March 13, 2014 order adjudicating Appellant's parentage and setting out the actions Appellant was ordered to complete. The March 13 order included the following: "[Appellant] is **ORDERED**, pursuant to § 263.106 Texas Family Code, to comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit." The trial court's subsequent orders stating, "All other temporary orders remain in full force and effect except as modified by this order," were also admitted into evidence.

8

**required of them below are necessary to obtain the return of the child and failure to fully comply with these orders may result in the restriction or termination of parental rights.**" Thus, this order notified Appellant that the actions listed in the order were necessary to obtain C.Y.'s return and that failure to fully comply with the orders could result in the termination of his parental rights.

Immediately following this notification, with Appellant's name in caps and bold, the order listed specific directives with which Appellant was required to fully comply.

### 1. Specific Directives

### a. Counseling

Appellant was ordered to "cooperate fully" in weekly counseling sessions as follows:

> **IT IS ORDERED** that [Appellant] shall attend and cooperate fully in weekly counseling sessions through Cumberland Children's Home . . .[5] to address the specific issues that led to the removal of the child from the home and any additional issues arising from the counseling sessions. [Appellant] shall [contact] Cumberland Children's Home . . . within 7 days of this Order being entered by the Court[] to schedule the first appointment. Said counseling sessions shall continue until the counselor determines that no further sessions are necessary or until further order of this Court. [Appellant] shall cooperate fully in any and all recommendations made through these counseling sessions.

---

[5]In the interest of brevity, we have excluded addresses and phone numbers of service providers, although these were included in the order.

After attending twelve of the seventeen scheduled appointments, Appellant was unsuccessfully discharged from counseling. The counselor reported that although he attempted during the sessions to address Appellant's past criminal history, past drug history, past domestic-violence problems, and current working situation, Appellant would discuss only his hatred for DFPS, insisting that he did not need to work the court-ordered services because he had never hurt a child. Appellant was described as generally belligerent and hostile during the sessions, and during the final session, the counselor reported that he feared for his own safety. Although his counselor attempted to help Appellant develop a childcare plan because of the long hours that Appellant worked as a cement truck driver, Appellant kept repeating, "That is common sense. I'll just drop her off at the babysitter."

Although Appellant had been ordered to "cooperate fully in any and all *recommendations* made through these counseling sessions" (emphasis added), his counselor recommended filial therapy, and Appellant participated in only four filial therapy sessions before he was unsuccessfully discharged. Filial therapy had been recommended as a means to increase bonding and attachment between Appellant and C.Y. by teaching him hands-on parenting skills and providing him more time with her. Appellant's caseworker reported that even though she pointed out to him that participation in filial therapy sessions would give him an extra hour of visitation a week with C.Y., Appellant had been very reluctant to consider it and had initially inquired if he could just "write a check and

10

be done with it." Although Appellant claimed during trial not to recall the portion of the order that required him to follow the recommendations from his service providers, Appellant did admit that he knew he had been ordered by the court to participate in filial therapy. And although he had assured the court that he was willing to participate in filial therapy, he admitted that—for reasons unknown to him[6]—he had been unsuccessfully discharged from the program.

### b. Drug and Alcohol Assessment

Appellant was ordered to "cooperate fully" in drug and alcohol assessment and follow all recommendations from that assessment, as follows:

> **IT IS ORDERED** that [Appellant] shall participate in a drug/alcohol assessment with First Steps of Denton County Outreach Program (First Steps) . . . . [Appellant] shall contact (First Steps) . . . within 7 days of this Order being entered, to schedule

---

[6]The clinical therapist who conducted the four filial therapy sessions that Appellant attended explained that she discharged him because she had not seen C.Y. progress as necessary to secure her placement with Appellant, because she had not seen Appellant follow the directions she gave him to make his relationship with C.Y. more sound and because she personally did not feel comfortable around Appellant, describing him as "a boiling pot" ready to explode. In her notes, which were admitted into evidence during trial, the therapist stated that because she expected the report to be shared with Appellant,

> it will only increase my apprehensions and feelings of never truly feeling safe around him. I am recommending that if he continues with any filial therapy, that he find a male therapist skilled with anger management-violence intervention techniques to best help [Appellant] recognize how he is perceived by others; especially if his future has him interacting with daycare/school personnel, parents of other children, pediatricians and dentists, and the other adults associated with raising a child.

11

said assessment and shall submit to and cooperate fully in the preparation of the assessment. [Appellant] shall follow any and all recommendations from that assessment.

Although Appellant completed this service by submitting to an assessment,[7] he failed to fully follow the assessment recommendations. The evaluation recommended that he attend AA/NA meetings three times per week, but, as discussed below, Appellant stopped attending those meetings after three months.

### c. AA/NA Meetings

Appellant was ordered to attend AA/NA meetings three times per week, by virtue of both the recommendation of First Steps and by explicit order of the trial court:

> **IT IS ORDERED** that [Appellant] shall attend and participate in not fewer than 3 AA/NA meetings per week until entering drug treatment and shall document his attendance to his caseworker . . . monthly. Said attendance shall begin within one week of the signing of this order.

Appellant admitted at trial that he only attended AA/NA meetings from July 27, 2014 to September 24, 2014. By way of explanation, Appellant testified that AA/NA was not for him because he was not powerless over alcohol and did not

---

[7]The evaluation revealed that Appellant had a proclivity for relationships with drug-addicted women who had open or recently-closed DFPS cases.

12

have to drink. He also acknowledged that he had consumed alcohol during the case even though he knew he had been ordered not to do so.[8]

### d. Safe, Stable, and Appropriate Housing

The trial court ordered Appellant to establish and maintain safe, stable, and appropriate housing for a period of at least six months:

> **IT IS ORDERED** that [Appellant] shall establish and maintain safe, stable and appropriate housing for a period of at least six months and continuing through the pendency of this suit.

Additionally, in October 2014, the trial court ordered him to "thoroughly deep clean his home and childproof it to CASA and the Department's satisfaction."[9] As an incentive, the trial court's order provided that once Appellant cleaned and childproofed the house (and began actively participating in filial therapy), his supervised visits would be increased to four hours per week and could take place in his home.

To assist him in knowing exactly what would be expected in order for Appellant to be in compliance with this order, Cindy Parker, Appellant's DFPS caseworker, gave him a specific checklist of tasks necessary to accomplish a deep clean and achieve a childproof condition for his home.

---

[8]Appellant was also ordered to submit to random drug testing, but these requirements were not addressed at trial.

[9]This order arose from concerns expressed after a home visit revealed excessive dirt on the floors and multiple safety hazards in the home. Photographs of the reported conditions were admitted into evidence at both the hearings that resulted in the order and the trial.

One of the identified hazards was a gas heater located on a wall in the room designated to be C.Y.'s bedroom. When Parker expressed concern about it, Appellant explained that it did not work. Nevertheless, Parker described it as "pos[ing] a threat all by itself, working or not, because it[']s a metal box that has very sharp corners," and she asked him to cover it. Approximately three months prior to trial, he had completed this, along with every other task on Parker's list.[10]

Additionally, in response to concerns voiced by the trial court judge, Appellant put his pit bull terrier in an outdoor pen when Parker, the court-appointed special advocate (CASA) worker, or C.Y. visited his home.[11] Despite the dog's history of aggression toward children and other dogs,[12] Appellant told Lindsey Barnes, the CASA worker, that he felt it was his duty to protect the dog "as much as it was to protect [C.Y.]." And while Appellant had previously

[10]Other tasks included removing a dangerous extra shower curtain in the bathroom, replacing missing wood slats and installing railing on the back porch, securing the hanging mini-blind cords to prevent a choking hazard for toddlers, and covering sharp corners of a table in C.Y.'s room with corner bumpers.

[11]During a preliminary hearing, the trial judge had admonished Appellant that until her concerns about the dog, which had previously bitten an adolescent girl on her face, requiring five stitches, were allayed, the dog should remain outside during C.Y.'s visits.

[12]The dog had also either bitten or scratched the two-year-old daughter of a woman who, along with her three children, lived with Appellant between 2006 and 2008. Whether bite or scratch, the wound resulted in a permanent facial scar. The woman did not seek medical treatment for her daughter until CPS intervened. Appellant also had a $1,814.46 small claims judgment against him resulting from a lawsuit that his aunt brought against him after his dog allegedly attacked her dog.

admitted to Barnes that the dog did not like arguments and that "if two people are arguing, somebody's going to get bit," Appellant's trial strategy, as he related it to Barnes, would be to prove to the court that the dog was not dangerous. His plan for proving this involved having his friends bring their children over to play with the dog so that he could record it and show the recording to the judge.

At trial, both Parker and Barnes also related other concerns about the safety, stability, and appropriateness of Appellant's home and why, even with his efforts to improve the home, they were not satisfied that the home was safe, stable, or appropriate for C.Y. For example, upon the discovery of watermelon vodka in his refrigerator during an unannounced visit, Appellant attributed ownership of the alcohol to one of his "lady friends." And when further pressed by Parker as to whether he allowed women to just come into his house with alcohol, he denied allowing women to just come in, clarifying that they did not wander around the house but rather would "walk straight in the front door and right to [his] bedroom." And, despite Appellant's contention that he was using the internet dating service PlentyofFish.com to try to meet women who could help him raise C.Y., according to Barnes, who accessed the website, Appellant had actually represented in his online profile that all of his children were over eighteen and that he was unsure as to whether he wanted to have more.

### e. Alcohol Consumption

Another requirement that Appellant failed to meet was the order to refrain from the use or consumption of alcohol:

**IT IS ORDERED** that [Appellant] shall refrain from the use or consumption of any alcoholic beverage.

During trial, Appellant acknowledged not only that he had consumed alcohol during the case, despite having been ordered not to do so, but also that he had consumed alcohol on the Saturday prior to the May 1, 2014 permanency hearing. When questioned about this at the May 1, 2014 hearing, Appellant admitted that he understood the trial court's orders but nonetheless chose to imbibe:

Q.   And you understand your orders, temporary orders say that you need to abstain from drugs and alcohol.

A.  Right, but one beer.  When was the last time I was drunk, was at Thanksgiving.

Q.  Okay.  So that's not my question, when did you get drunk.

The last time you drank was last weekend?

A.  Yes, ma'am, I drank one beer.

**f.  Visitation, Child Support, and Medical Support**

Appellant was also ordered to comply with the order's attachments pertaining to visitation, child support, and medical support.   Attachment A addressed visitation, stating, in pertinent part,

**IT IS ORDERED** that [Appellant], Temporary Possessory Conservator appointed in this Order shall have visitation with the child, [C.Y.], as follows:  one hour supervised visitation every week with the aforementioned child, [C.Y.], at the Denton [DFPS] Office . . . or an alternative location as designated by [DFPS] . . . .

Attachment B, pertaining to child support, provided:

16

Pursuant to Section 154.001, Texas Family Code, the Court finds that [Appellant] is obligated to support [C.Y.], the child the subject of this suit.

**IT IS ORDERED** that [Appellant] shall pay to [DFPS] for the support of the child, [C.Y.], $50.00 per month, with the first installment being due and payable on the 1st day of the month . . . and a like installment due and payable on the 1st day of each month thereafter until further order of this Court.

**IT IS FURTHER ORDERED** that all child support payments are to be made through the Texas Child Support Disbursement Unit, P.O. Box 659791, San Antonio, Texas 78265-9791, for distribution by that agency to [DFPS] for the support of the child. All payments shall be identified by obligor name, obligee name, cause number of this case and the date on which the payment is made.

While Appellant met the visitation requirement, and, as a result, saw his visitation increase during the case in subsequent orders,[13] he failed to meet the child support requirement.

At trial, Appellant acknowledged that he knew he had been ordered to pay child support but that he only made three or four payments. He explained that even though the order remained in effect, after several checks had been returned to him from the Attorney General's office, he stopped paying. And despite the fact he had hired an attorney more than a year prior to trial to represent him in

---

[13]On October 27, 2014, the trial court extended the case's dismissal date after finding that Appellant required additional services and that DFPS believed that it was in C.Y.'s best interest to give Appellant additional time to complete his service plan.

17

the case, other than to ask two unidentified people in the hallway what he should do,[14] he never attempted to resolve the problem with the returned checks.[15]

Attachment C ordered Appellant to pay DFPS $25 per month in medical support as additional child support. For the same reasons Appellant gave regarding his failure to make child support payments, he failed to meet the medical support requirement as well.

## 2. Discussion

While Appellant complied with many of the trial court's March 13, 2014 orders,[16] the language in the order as set out above expressly notified Appellant

---

[14]According to Appellant, the two people he asked "blew it off" and told him "don't worry about it."

[15]Asked why he did not go to the DFPS office and say "[h]ere is my cause number, here is my child support check, help me figure out what is going on," Appellant testified, "I wasn't ever going to do that."

[16]Appellant was ordered to "cooperate fully" in a mental health assessment, and he completed this service. His mental health records from 2006, which were admitted into evidence, reflected that he had previously been diagnosed with major depressive disorder, bipolar, and other substance-induced mood disorder. The records also contained an admission by Appellant that he had a temper that his girlfriend could not handle and that he had been physically aggressive towards her.

Appellant was ordered to complete the FOCUS Fatherhood Program, which he completed.

Appellant was ordered to participate in the Batterer Intervention Prevention Program (BIPP) because of "his assault[-]family violence history with multiple females," including his previous DFPS history as an alleged batterer, and C.Y.'s mother's allegations in April 2013 about having been beaten by him when she was pregnant with C.Y. Although Appellant completed BIPP, he complained that he had already been through this service once and remained unpersuaded that

18

that "each of the actions" listed in the order were "necessary to obtain the return of the child" and that failure to "fully comply" could cost him his parental rights. This provision, set forth in bold and large font, clearly and explicitly warned of the necessity of complying with the trial court's orders in full. The March 13, 2014 order, as well as the subsequent orders, established with particularity the actions necessary for the child's return.[17] The subsequent orders clearly provided that all of the trial court's orders, except as modified, remained in full force and effect.

Although Appellant takes issue with the trial court's use of the word "may" preceding the warning of potential consequences for failure to fully comply with the orders, in light of the supreme court's disposition in *In re J.F.C.*, 96 S.W.3d 256, 277 (Tex. 2002), we conclude that the trial court's orders were sufficiently concrete to avoid a violation of his due process rights.

In *J.F.C.*, the supreme court implicitly held that the order was sufficiently specific under subsection O when "[e]ach order specifically advised the parents that failure to provide a safe environment within a reasonable time *could* result in

---

these were skills he needed to learn as a parent. While his criminal records do reflect that he was ordered to attend BIPP as part of his community supervision in 1996, the records also list his failure to complete it as one of the bases for revocation of his community supervision.

Appellant was ordered to establish and maintain employment and to refrain from engaging in criminal activities, using illegal drugs, or having unsupervised contact with children under sixteen. He met all of these requirements.

[17]The filial therapy recommendation was expressly incorporated into the court's October 27, 2014 order.

restriction or termination of their parental duties and rights or the children not being returned to them" and directed each parent to perform specific acts. *Id.* (emphasis added). The supreme court held that while the parents had partially complied with some of the provisions and offered excuses for noncompliance for others, their complete and indisputable failure to comply with payment of monthly child support (although capable of doing so) and their failure to attend any anger control classes or parenting classes and to submit to individual psychiatric evaluations and random drug tests conclusively established as a matter of law that they had failed to comply with the court's orders specifying the actions they had to take for DFPS to return the children to them. *Id.* at 277–79. *See generally In re J.S.*, 291 S.W.3d 60, 67 (Tex. App.—Eastland 2009, no pet.) (stating that subsection O does not quantify any particular number of provisions of the family service plan that a parent must not achieve in order for the parental rights to be terminated, does not quantify the degree of a parent's conduct that will be deemed a failure to achieve a particular plan requirement, does not encompass an evaluation of a parent's partial achievement of plan requirements in order to determine whether or not the parent failed to comply with the plan, and does not make a provision for excuses for the parent's failure to comply with the family service plan); *In re C.M.C.*, 273 S.W.3d 862, 875 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (op. on reh'g) ("Texas courts have held that substantial compliance is not enough to avoid a termination finding under section 161.001([(1)](O).").

20

As for Appellant's contention that there was no evidence during the trial or throughout the pendency of the case that he was ever informed that it was necessary for him to complete all of the actions listed in the service plan, this argument does not find support in the record. On multiple occasions during trial, Appellant testified he understood exactly what the trial court had ordered him to do but nevertheless failed to perform as ordered. The record of each hearing prior to trial also demonstrates that Appellant understood exactly what he was supposed to do and why.

At the outset, during the first hearing, the trial judge spoke directly to Appellant, who at that point was representing himself:

> THE COURT: And so the Court will admonish you, [Appellant], that the [DFPS] service plan is a very important document. Its purpose is to help you provide your child with a safe environment within the reasonable period specified in the plan. The Court will review whether or not progress has been made under the service plan at all subsequent hearings. This review will include whether you have acquired or learned any specific skills or knowledge stated in the plan.

> If you are unwilling or unable to provide your child[] with a safe environment, your parental and custodial duties and rights may be restricted or terminated or your child may not be returned to you. Do you understand that, sir?

> [Appellant]: Yes, ma'am.

> . . . .

> THE COURT: . . . I would just further add that the things that you will be asked to do and are being asked to do under the service plan all contribute to whether or not this Court will determine at some future date whether or not you are an appropriate person to parent your child. Do you understand that?

21

[Appellant]: Yes, ma'am.

THE COURT: Okay. So whether there are some things in there you think aren't necessary or that you like to do or don't like to do is really irrelevant. What matters is all of that works together to allow this Court to have some determination about whether or not you would be an appropriate person to parent your child. Do you understand that?"

[Appellant]: (Nods head.)

Just a few months later, at the permanency hearing, Appellant testified that he understood that DFPS, the court, the CASA worker, and the child's ad litem attorney had to feel confident that he had the necessary skills to take care of an infant, and he acknowledged that at that point all the trial court had to go on was what Appellant's history reflected.[18] Toward the conclusion of that hearing, the

---

[18]Appellant's criminal records from 1995 to 2009, which were admitted into evidence during the trial and discussed at the hearing, illustrate a history of assaults, violations of protective orders, and other offenses ranging from misdemeanors to felonies, many guilty pleas in exchange for community supervision, and the revocation of community supervision based on his failure to comply with the court's terms and conditions (including the order that he remain drug-free). In 2001, he was sentenced to four years' confinement for possessing a prohibited weapon (incendiary bomb—Appellant testified that it was a Molotov cocktail but denied that he had taken it over to his ex-wife's house) and assault on a public servant. In 2004, he was convicted of assault-family violence after pleading guilty and was sentenced to two years' confinement. In 2009, Appellant was convicted of driving while intoxicated and received fifteen months' community supervision, which was revoked five months later when he admitted to having tested positive for drugs, among other violations. During the case, Appellant remained steadfast in the notion that his past should not matter and that, as he told one of the caseworkers, "just because he has criminal history [of] assaulting adults that that doesn't mean he will assault a child."

The trial court, DFPS, the CASA worker, and the child's ad litem attorney were also aware of Appellant's history and involvement with C.Y.'s mother due to

trial court once again admonished Appellant, "Just so long as we're clear here, everything that's in that Service Plan that you've been asked to do, this Court expects you to do."

Four months after that, at the conclusion of the October 23, 2014 hearing, the trial court repeated the admonitions, yet again reminding Appellant of the obligatory nature of the court's directives:

> THE COURT: Now, here are things I want you to do, [Appellant], and these are not suggestions, these are orders, okay? And I know there's been things I've asked you to do, and you haven't done them, and I want you to understand I'm not coming up with this stuff to make you miserable.
>
> I'm asking you to do these things because here is what I have to live with and what I have to make a decision about at the end of this, and that is that this baby girl of yours is taken care of.
>
> Do you understand that?
>
> [Appellant]: Yes, ma'am.
>
> . . . .
>
> THE COURT: The other thing, we've discussed the filial therapy, and that's a big word for teaching somebody how to be a good parent is what it is. You haven't done that.
>
> I'm not happy about that, not a bit happy you haven't done that, because we had a discussion about that very specifically here

---

her earlier CPS case. The caseworker testified that DFPS discovered that C.Y.'s mother was living with Appellant when she showed up for a parent-child visit and "had some marks and bruises on her arms and she was very upset because of a domestic violence situation between her and [Appellant]." When questioned about this, Appellant denied that the family violence incident had occurred, stating that "if police weren't called then it didn't happen."

23

where I told you that you may not think it's important, but I think it's important, and it's important for your daughter.

At the end of the day, she's the only one I really care about, okay? So you are going to do filial therapy.

The other thing that has to happen before you have these four-hour extended visits on Sunday, you are going to have to get enrolled in filial therapy. My understanding how that should happen is that is a therapy that you are supposed to participate in with your daughter. In other words, you don't go sit in some therapist's office; you are supposed to participate in that with your child.

So that will have to be set up either on your Sunday afternoon that we do some of that therapy or some other time, but that is something you have to demonstrate to me that you are going to do by being enrolled in that class.

. . . .

These things -- I want to be clear: These things we talk about in court, these are not suggestions, these are things you do until we decide you can be a father.

You don't get to pick and choose what you're going to do.

You understand that?

[Appellant]: Yes, ma'am.

At each point along the way, Appellant was advised that the trial court's directives were mandatory, not advisory, and at each point, Appellant assured the trial court that he understood her admonitions.

For all of the above reasons, Appellant's third issue, that he was not affirmatively notified in compliance with subsection O that completion of the actions listed in the plan was a necessary requirement for the child's return, is

24

overruled. Based upon our resolution of Appellant's second and third issues, we do not reach his first issue.[19] *See* Tex. R. App. P. 47.1.

### III. Conclusion

Having overruled Appellant's dispositive issues, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and SUDDERTH, JJ.

DELIVERED: October 22, 2015

---

[19]In his first issue, Appellant complains that the evidence was legally and factually insufficient to support DFPS's retention of conservatorship when no evidence was presented at the April 24, 2014 permanency hearing that would have prevented the child's return to him under family code section 262.201(b)(1). Even if our resolution of Appellant's second and third issues did not moot this issue, Appellant failed to adequately preserve it for our review when neither of his motions to modify temporary orders and request for placement and monitor referenced section 262.201, and he merely asked the trial court for "some possession of the child." *See* Tex. R. App. P. 33.1.